EXHIBIT C

ANNE MARIE MURPHY (SBN 202540)
amurphy@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California 94010
Telephone: (650) 697-6000

GARY ALLAN PRAGLIN (SBN 101256)
gpraglin@cpmlegal.com
LESLIE A. HAKALA (SBN 199414)
lhakala@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Blvd Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EMMA MARTIN,** **ELIZABETH GAGLIANO** and **KATHRYN SESSINGHAUS,** individually and as heirs of **VINCENT PAUL MARTIN**, deceased,<br><br>        Plaintiffs,<br>    v.<br>Serrano Post Acute LLC d/b/a **HOLLYWOOD PREMIER HEALTHCARE CENTER,** a/k/a Serrano Healthcare, a/k/a Serrano North Convalescent Hospital; **BENJAMIN LANDA**, an individual; **MARCEL ADRIAN SOLERO FILART**, an individual; and, **DOES 1-50,**<br><br>        Defendants. | Case No. 2:20-cv-05937-DSF-SK<br><br>[Removal from Superior Court California, County of Los Angeles, Case No. 20STCV19545]<br><br>**FIRST AMENDED COMPLAINT**<br><br>1. **VIOLATIONS OF THE ELDER AND DEPENDENT ADULT CIVIL PROTECTION ACT** (Welfare & Institutions Code §15600 *et seq.*)<br><br>2. **NEGLIGENCE**<br><br>3. **WRONGFUL DEATH**<br><br>4. **FRAUDULENT CONCEALMENT**<br><br>5. **FRAUDULENT MISREPRESENTATION**<br><br>**JURY TRIAL DEMANDED** |

## Table of Contents

Page(s)

I.     INTRODUCTION........................................................................................1

II.    JURISDICTION AND VENUE.................................................................7

III.   PARTIES ......................................................................................................8

   A. Plaintiffs ..............................................................................................8

   B. Defendant HPHC .................................................................................9

   C. Defendant Benjamin Landa .................................................................9

   D. Defendant Marcel Adrian Solero Filart ..............................................9

   E. DOE Defendants ................................................................................10

IV.   AGENCY/JOINT VENTURE/AIDING AND ABETTING/CONSPIRACY ...........10

V.    STANDING TO BRING THIS SURVIVAL ACTION ...............................11

VI.   FACTUAL BACKGROUND....................................................................11

   A. The Background of Elder Abuse and Neglect In California and at HPHC ......................11

   B. Understaffing at HPHC......................................................................13

   C. Mr. Martin Entered HPHC for Post-Surgery Care............................14

   D. The Family's Final Visits to Mr. Martin in February 2020 ...............14

   E. COVID-19 Takes Hold at HPHC and HPHC Goes Into Lockdown ...............15

   F. Timeline of Vince Martin's Last Days .............................................15

   G. Staff Admits to Mr. Martin's Family That There Is a Staffing Crisis: Two Nurses Were Caring for Eighty-Three Residents .........................17

VII.  CAUSES OF ACTION .............................................................................19

    FIRST CAUSE OF ACTION: ELDER ABUSE AND NEGLECT UNDER THE..........19

    ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT. ...............19

    (Against All Defendants) .......................................................................19

    SECOND CAUSE OF ACTION:  NEGLIGENCE..........................................21

    THIRD CAUSE OF ACTION: WRONGFUL DEATH....................................22

    FOURTH CAUSE OF ACTION: FRAUDULENT CONCEALMENT ..........................25

    FIFTH CAUSE OF ACTION: FRAUDULENT MISREPRESENTATION ..................26

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**VIII. PRAYER FOR RELIEF**................................................................................**27**

   DEMAND FOR JURY TRIAL ............................................................................28

Plaintiffs **Emma Martin**, **Elizabeth Gagliano** and **Kathryn Sessinghaus**, individually and as heirs, and successors in interest of **Vincent Paul Martin**, deceased, bring this action for damages against defendants **Serrano Post Acute LLC d/b/a Hollywood Premier Healthcare Center a/k/a Serrano Healthcare, a/k/a Serrano North Convalescent Hospital** or ("HPHC"); **Benjamin Landa** ("Landa"); and **Dr. Marcel Filart** ("Filart", and collectively with HPHC and Landa, "Defendants").

## I.    INTRODUCTION

1.     This case involves one of the worst outbreaks of COVID-19 in any nursing home in the United States.  Licensed to have just 99 residents, at one point, HPHC had the incredible number of sixteen (16) elderly residents **dead** and seventy-two (72) residents infected, along with thirty-seven (37) staff (109 infections)—as well as others **hidden** from the public.

2.     This case involves just one of the individuals that has died—eighty-four-year-old Vincent Paul Martin ("Mr. Martin" or "Vince"). Mr. Martin's wife and daughters intend to uncover how COVID-19 was allowed to rage uncontrolled through Hollywood Premier Healthcare Center ("HPHC").



(Source: Family picture of Mr. Martin celebrating his birthday at HPHC in August 2015)

3.     Mr. Martin did not lose his life because of an unavoidable Act-of-God, rather he lost his life because HPHC's owners and managers had a long-standing practice of keeping the nursing home understaffed and skirting safety and infection controls as set forth below. Several of the individuals responsible for HPHC have had past brushes with the law – Defendant Landa was found liable for human trafficking of Filipino nursing staff, and Defendant Filart was named as having received kickbacks in an illegal Medicare-Medi-Cal scam that resulted in a $42 million dollar settlement with the U.S. Government.

4.     Mr. Martin died in the early hours of Saturday April 4, 2020.  As of at least April 1, 2020, HPHC and its staff had known that some of the nursing home's other residents had tested positive for COVID-19, and also had known that Mr. Martin displayed symptoms consistent with COVID-19.  Nonetheless, HPHC did not automatically test Mr. Martin for COVID-19 based on his symptoms.  In fact, Defendants did not test Mr. Martin for the virus until it was too late—Mr. Martin's positive test result came back the day **after** he died.

5.     Defendants knew that there was a serious outbreak at HPHC by mid-March 2020 when HPHC's Administrator Juhn Cayabyab, NHA, contracted COVID-19, yet HPHC did not test its residents and staff for COVID-19. It was only at the insistence of Mr. Martin's family that he was tested at all, despite the obvious COVID symptoms Mr. Martin was exhibiting.

6.     HPHC, individually and through its staff and employees, **admitted** to the family that the 99-bed nursing home had only two nurses working, just days before Mr. Martin's death. Shortly after Mr. Martin's death, HPHS made national news due to the severity of the COVID-19 outbreak at the facility, yet the families of numerous residents were left in the dark about the true situation within HPHC. The fraudulent concealment of the conditions was overwhelming.

7.     This situation at the HPHC nursing home eventually became so serious and deadly that HPHC was one of a handful of facilities in LA County where the National Guard was deployed in late April. Tragically, this help came too late for Mr. Martin and many of the other residents to prevent their deaths.



National Guard Sgt. Joseph Schlitz enters the Hollywood Premier Healthcare Center, which has seen 25 coronavirus cases among staff and 29 among residents. (Brian van der Brug/Los Angeles Times)



///

///

///

///

///



8.     Mr. Martin's own attending physician, Dr. Marcel Filart, HPHC's Medical Director, failed to put COVID-19 on Mr. Martin's death certificate, despite Mr. Martin's positive COVID-19 test result. (**Exhibit 2**). In addition, HPHC intentionally did not inform the funeral home that Mr. Martin was COVID-19 positive or COVID-19 suspected, putting the funeral home staff in grave danger. Undisputedly, HPHC knew that it was experiencing an outbreak at this point – even its own Administrator was out sick with COVID-19 since March.

9.     Mr. Martin's wife, Plaintiff Emma Martin is a pediatric nurse practitioner.  She was deeply troubled when she last visited the facility in early March to drop off items for her husband and observed the lack of personal protective equipment ("PPE") being used at HPHC despite the emerging pandemic. What she did not know at the time was that HPHC had been cited by the State of California in June 2019 for deficient PPE practices, as discussed in greater detail in **Exhibit 3**, pages 4-5.  Again, this is not a situation where a well-run nursing home was caught off guard by the pandemic—HPHC's deficient and dangerous practices predate the pandemic.

10.     Just three days after Mr. Martin's death, one of the HPHC nursing staff posted the following picture on Facebook – which is notable both for the claim that this staff member had been working 20 hour shifts – and because she was at a nursing station with no PPE:



11.     Mr. Martin's family had been requesting HPHC's nursing records pertaining to Mr. Martin's care since April 10, 2020. As of the date this litigation began on July 1, 2020, **HPHC had still refused** to provide them, saying that medical records requests must go through "corporate offices" per facility policies. The records department staff told Lisa that "corporate" needs to approve the disclosure of records before they are provided to family

members. HPHC's delay was illegal under state and federal law. *See*, 42 CFR § 483.10; Cal. Health and Safety Code § 123110.

12.    There are many heroes among our Country's nurses, however, the owners and operators of HPHC are not heroes. They have profited on the backs of senior citizens, their families, as well as Medicare and Medi-Cal – and on the backs of their overworked staff. According to court records, one of the owners of HPHC, Benjamin Landa, was found liable for human trafficking of Filipino nursing staff last year. (See, **Exhibit 4**)[1]

13.    Mr. Martin necessarily contracted COVID-19 from the HPHC staff—the very group that had a legal obligation to protect him from health and safety hazards.  His death, therefore, was preventable, as was much of his pain and suffering.  His last days were spent in horrific circumstances, in a room with at least two other residents and without his wife and daughters by his side.

14.    It was entirely foreseeable that COVID-19 would rage like a wildfire through the rooms of Hollywood Premier Healthcare Center, given that there were not enough staff to isolate and care for positive residents. When staff were forced to travel between COVID-19 positive and COVID-19 negative seniors, they spread highly infectious disease in their wake. Also contributing to the firestorm was HPHC's practice of cramming small resident rooms with multiple elderly residents. Mr. Martin was housed in a small room with two other residents.

15.    As a nursing home, HPHC was charged with providing much needed care and rehabilitation services to dependent and elderly adults in Los Angeles County.  Like other skilled nursing facilities ("SNFs"), HPHC was entrusted with highly vulnerable individuals who often had multiple physical and cognitive impairments that required extensive assistance in the basic activities of daily living such as dressing, feeding, and bathing.

---

[1] *See*, **Exhibit 4**, which includes the cover sheets of the relevant court rulings: *Paguirigan v. Prompt Nursing Emp't Agency LLC*, No. 17-cv-1302 (NG) (JO), 2019 U.S. Dist. LEXIS 165587 (E.D.N.Y. Sep. 23, 2019), *Paguirigan v. Prompt Nursing Emp't Agency LLC*, No. 17-cv-1302 (NG) (JO), 2020 U.S. Dist. LEXIS 4837 (E.D.N.Y. Jan. 9, 2020). Only discovery will tell whether such human rights abuses extended to HPHC's nursing staff.

16.     Like the other residents housed at HPHC, Mr. Martin was entirely dependent on HPHC. HPHC's most important duty was to protect its residents from health and safety hazards. HPHC failed to provide this adequate care and, as a result, Mr. Martin contracted COVID-19, succumbed to the disease, and died without family by his side. HPHC must be held accountable.

17.     The California Legislature has recognized the important role of civil litigation in remedying abuse and neglect of elders and dependent adults. As stated in the "Elder Abuse and Dependent Adult Civil Protection Act" ("EADCPA"):

> The Legislature … finds and declares that infirm elderly persons and dependent adults are a disadvantaged class, that cases of abuse of these persons are seldom prosecuted as criminal matters, and few civil cases are brought in connection with this abuse due to problems of proof, court delays, and the lack of incentives to prosecute these suits.

(California Welfare & Institutions Code Section 15600.)

18.     Plaintiffs want to ensure that Mr. Martin's death is not just another sad statistic.

## II.     JURISDICTION AND VENUE

19.     Venue is proper in this County because Defendant is located and/or performs business in this County, and a substantial part of the events, acts, omissions, and transactions complained of herein occurred in this County. Defendants operate the SNF at issue in this case at 5401 Fountain Avenue Los Angeles, CA 90029.

20.     Each Defendant has sufficient minimum contacts with California, and has purposely availed itself of benefits and protections of California, and does business in California so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

21.     The amount in controversy exceeds the jurisdictional minimum of this Court.

///

///

///

## III.   PARTIES

### A.   Plaintiffs

22.   Plaintiff Emma Martin ("Emma") is, and at all times herein mentioned was, the wife and successor in interest and heir of the decedent, Vince Martin.   Emma Martin was actively involved in her husband's care and visited Mr. Martin frequently.  Emma Martin is 82-years old and is a retired pediatric nurse practitioner. Plaintiff Emma Martin is lawfully entitled to pursue all claims and causes of actions for damages pursuant to Code of Civil Procedure sections 377.32, 377.60, 377.61, Welfare and Institution Code section 15657.3(d), and Probate Code section 48.  (Her declaration to this effect pursuant to CCP sec. 377.32 is attached as **Exhibit 5** to this First Amended Complaint.)

23.   Plaintiff Elizabeth Gagliano ("Lisa") is, and at all times herein mentioned was, the daughter and successor in interest and heir of the decedent, Vince Martin.  Elizabeth Gagliano was involved in her father's care and visited Mr. Martin when in town. Plaintiff Elizabeth Gagliano is lawfully entitled to pursue all claims and causes of actions for damages pursuant to Code of Civil Procedure sections 377.32, 377.60, 377.61, Welfare and Institution Code section 15657.3(d), and Probate Code section 48.  (Her declaration to this effect pursuant to CCP sec. 377.32 is attached as **Exhibit 6** to this First Amended Complaint.)

24.   Plaintiff Kathryn Sessinghaus ("Kathy") is, and at all times herein mentioned was, the daughter and successor in interest and heir of the decedent, Vince Martin.  Kathy was actively involved in her father's care and visited Mr. Martin frequently.  Plaintiff Kathy Sessinghaus is lawfully entitled to pursue all claims and causes of actions for damages pursuant to Code of Civil Procedure sections 377.32, 377.60, 377.61, Welfare and Institution Code section 15657.3(d), and Probate Code section 48. (Her declaration to this effect pursuant to CCP sec. 377.32 is attached as **Exhibit 7** to this First Amended Complaint.)

25.   Plaintiffs Elizabeth Gagliano and Kathy Sessinghaus are the only surviving children of Vince Martin.

///

///

**B.**   <u>**Defendant HPHC**</u>



26.    Serrano Post Acute LLC d/b/a Hollywood Premier Healthcare Center was, at all times relevant herein, a skilled nursing facility which provides services at 5401 Fountain Avenue Los Angeles, CA 90029, which is also its principal place of business.

**C.**   <u>**Defendant Benjamin Landa**</u>

27.    Mr. Landa owns and/or controls HPHC. Mr. Landa is a resident of Brooklyn, New York.

**D.**   <u>**Defendant Marcel Adrian Solero Filart**</u>

28.    Defendant Marcel Adrian Solero Filart ("Filart") is, and at all times relevant hereto was, a resident of Los Angeles County, California; a physician licensed to practice medicine in the State of California; and Medical Director at HPHC. As reflected in <u>**Exhibit 8**</u>, Filart was named in a 2016 False Claims Act case as having received kickbacks—the case was later settled by the Department of Justice for $42 million dollars.

29.    In or about June 2018, he assumed direct responsibility for serving as Mr. Martin's attending physician. However, medical records obtained only after this case was filed, reveal that Filart never actually visited Mr. Martin in person in complete abrogation of his duties, both as Medical Director and as Mr. Martin's physician.

30.     As Medical Director of HPHC, he was also responsible for reviewing and evaluating administrative and patient care policies and procedures. CCR 22 CA ADC § 72305.

### E.     DOE Defendants

31.     Plaintiffs are ignorant of the names of those Defendants sued as DOES 1 through 50 and for that reason have sued DOE Defendants by fictitious names.  Plaintiffs further allege that each of said fictitious DOE Defendants is in some manner responsible for the acts and occurrences hereinafter set forth.  Plaintiffs will seek leave of the court to amend this Complaint to show their true names and capacities when the DOE Defendants are ascertained, as well as the manner in which each fictitious Defendant is responsible for the damages sustained by Plaintiffs.

## IV.     AGENCY/JOINT VENTURE/AIDING AND ABETTING/CONSPIRACY

32.     Plaintiffs are informed and believe, and upon such basis allege, that at all times herein mentioned, each of the Defendants, including those named as DOE defendants, herein was an agent, servant, employee and/or joint venturer of each of the remaining Defendants, and was at all times acting within the course and scope of said agency, service, employment, and/or joint venture.

33.     Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein.  In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of his/her primary wrongdoing and realized that his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

34.     Defendants, and each of them, conspired with each other and with others, to perpetrate the unlawful scheme on Plaintiffs, as alleged in this Complaint.  In so doing, each of the Defendants have performed acts and/or made statements in furtherance of the said conspiracy, while at all times acting within the scope of and in furtherance of the conspiracy alleged in this Complaint, and with full knowledge of the goals of that conspiracy.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

## V.   STANDING TO BRING THIS SURVIVAL ACTION

35.   Pursuant to the provisions of Code of Civil Procedure section 377.32 and Welfare Institutions Code section 15657.3(d), Plaintiffs Emma Martin, Lisa Gagliano and Kathy Sessinghaus ("Plaintiffs"), as successors-in-interest to decedent Vince Martin, are lawfully entitled to pursue all survival claims and causes of action for damages on behalf of decedent Vince Martin.

36.   Additionally, pursuant to the provisions of Welfare and Institutions Code section 15657.3(d) and section 48 of the Probate Code, Plaintiffs are interested persons, as defined by section 48 of the Probate Code, and are thus each lawfully entitled to pursue all claims and causes of action in a survival action on behalf of decedent Vince Martin. Successor-in-Interest Declarations are attached as **Exhibits 5-7.**

## VI.   FACTUAL BACKGROUND

37.   84-year old, Vince Paul Martin died of COVID-19 on Saturday April 4, 2020. He was a resident of HPHC, which is located in Hollywood (5401 Fountain Avenue Los Angeles, CA 90029). Vince was born in Brooklyn, New York. He served in both the U.S. Army and the Army Reserve in the 1950s and 1960s. After getting out of the Army, he attended the Pratt Institute in New York and became a graphic designer. He then worked in advertising in the entertainment industry, including time on the Jack Parr Show, and worked at advertising agencies in New York and Los Angeles.  In the 1960s, he moved to Los Angeles where he worked as a graphic artist for the City of Los Angeles, both with the Los Angeles Public Libraries and the Department of Water and Power. He retired in the mid-1990s.

38.   Vince was married to Plaintiff Emma from 1964 until his death at HPHC. He and Emma had two daughters (Plaintiffs Lisa and Kathy) and five grandchildren.

### A.   The Background of Elder Abuse and Neglect In California and at HPHC

39.   While SNFs are expected to keep their residents safe from harm, the truth is that abuse and neglect in such facilities has become a problem throughout the nation and the State of California. HPHC has a history of providing sub-standard care.

40.    In 2019 alone, the United States Department of Health and Social Services cited HPHC for the following deficiencies:

- Nursing staff failed to don a gown and mask when caring for an infected resident who was in isolation, instead the staff member touched the resident and then did not wash their hands;

- Failed to ensure proper infection controls due to failure to remove and clean equipment with the "potential to spread infection and transmission of communicable disease";

- Failed to label oxygen tubing with a resident's name, a "deficient practice" that "had the potential to result in infection to the resident";

- Putting four residents in a 420 square foot room (HPHC actually had a fifth unoccupied bed in this small space);

- Not reporting an injury of unknown source to the State;

- Failed to protect from fall hazards;

- Illegally implementing advance care directives (end of life plans) without needed consent, with the potential of denying residents necessary treatments;

- Keeping call lights out of reach of residents;

- Improper use of physical restraints;

- Failing to put care plans in place for residents;

- Failing to provide needed eyewear, and instead allowing a resident to use glasses that were taped together with packaging tape and duct tape;

- Failing to properly angle a resident's bed to prevent the development of pneumonia;

- Failing to post daily staffing information for review by residents and visitors.

41.    Again, HPHC was cited for all the above deficiencies in 2019 (plus additional deficiencies that are not listed). The situation was equally bleak in 2018. Given the circumstances that prevailed at HPHC pre-COVID-19, it was inevitable that the nursing home would be ravaged by COVID-19. This is supported by a GAO study dated May 20, 2020, which explored the prevalence of infection prevention and control deficiencies in nursing homes prior to the COVID-19 pandemic and drew a correlation between facilities with

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

deficiencies in 2018-2019 and current COVID-19 outbreaks. *Infection Control Deficiencies Were Widespread and Persistent in Nursing Homes Prior to COVID-19 Pandemic*, GAO-20-576R: Published: May 20, 2020 (accessible at https://www.gao.gov/assets/710/707069.pdf).

**B.   Understaffing at HPHC**

42.   According to a 2016 UCSF study, HPHC (f/k/a Serrano North Convalescent Hospital), had 95.80% turnover—among the worst in the State of California.[2] That same report noted that the facility had below average staffing of supervisors, Registered Nurses ("RNs"), Licensed Vocational Nurses ("LVNs") and Licensed Practical Nurse ("LPN"), instead relying on Nursing Assistants with minimal qualifications. HPHC chose to staff the nursing home with underqualified staff in order to save money and increase profits for the owners.

43.   In keeping with the earlier UCSF study, Medicare.gov currently rates HPHC as "below average":

## HOLLYWOOD PREMIER HEALTHCARE CENTER

**Overall rating** ⓘ:   ★★ ● ● ●

Below Average

Also, per Medicare.gov, HPHC has overall below average staffing levels:

### Staffing

The information in this section includes registered nurses (RN), licensed practical/vocational nurses (LPN/LVN), nurse aides, and physical therapists (PT). Physical therapists aren't included in the "all staffing" star rating.

The "staffing" star rating takes into account that some nursing homes have sicker residents and may therefore need more staff than other nursing homes whose residents aren't as sick.

| | HOLLYWOOD PREMIER HEALTHCARE CENTER | CALIFORNIA AVERAGE | NATIONAL AVERAGE |
|---|---|---|---|
| **Staffing rating** | ★★ ● ● ●<br>Below Average | | |
| Average number of residents per day | 97.4 | 86.6 | 85.9 |
| Total number of licensed nurse staff hours per resident per day | 1 hour and 19 minutes | 1 hour and 46 minutes | 1 hour and 34 minutes |
| RN hours per resident per day | 22 minutes | 38 minutes | 41 minutes |
| LPN/LVN hours per resident per day | 57 minutes | 1 hour and 8 minutes | 52 minutes |
| Nurse aide hours per resident per day ⓘ | 2 hours and 25 minutes | 2 hours and 35 minutes | 2 hours and 18 minutes |
| Physical therapist staff hours per resident per day ⓘ | 4 minutes | 6 minutes | 5 minutes |

### Registered Nurse (RN) staffing only

Registered nurses (RNs) are licensed healthcare professionals who are responsible for the coordination, management and overall delivery of care to the residents. Some nursing home residents who are sicker than others may require a greater level of care, and nursing homes that have more RN staff may be better able to meet the needs of those residents.

| | HOLLYWOOD PREMIER HEALTHCARE CENTER | CALIFORNIA AVERAGE | NATIONAL AVERAGE |
|---|---|---|---|
| **Registered Nurse (RN) staffing rating** | ★★ ● ● ●<br>Below Average | | |
| Average number of residents per day | 97.4 | 86.6 | 85.9 |
| RN hours per resident per day | 22 minutes | 38 minutes | 41 minutes |

44.     As noted by a leading UCSF study, "[m]any California studies have demonstrated that serious quality of care problems have been associated with inadequate staffing levels, and most importantly, low RN staffing (Kim, *et al.*, 2009a 2009b; Schnelle, *et al.*, 2004)." *California Nursing Home Chains by Ownership Type Facility and Resident Characteristics, Staffing, and Quality Outcomes in 2015.* UCSF, Dr. Charlene Harrington and Dr. Leslie Ross.

45.     HPHC's chronic problems with understaffing continued—even worsened—during the COVID-19 crisis within HPHC.  Plaintiffs were told by nurses that the facility was short-staffed, and at least one HPHC nurse complained repeatedly on her Facebook page that she was being forced to work 2 to 3 shifts back-to-back, and that she'd been working for 20 hours straight.

## C.     Mr. Martin Entered HPHC for Post-Surgery Care

46.     Vince Martin went to HPHC in January 2014 due to spinal stenosis after undergoing surgery. At the time, Mr. Martin required more daily in-home care than his elderly wife was able to provide, and the entire family agreed that a nursing home was the best option.

47.     Prior to the outbreak, Plaintiffs visited Mr. Martin frequently. Given Mr. Martin's normal routines, and given the fact that family was not permitted to visit, the only way that Mr. Martin contracted COVID-19 was from the HPHC staff, third parties that HPHC brought into the facility, or other residents.

48.     As the COVID-19 pandemic began to emerge in California in February, Plaintiffs noted the apparent lack of infection control protocols in place at HPHC to deal with the outbreak.

## D.     The Family's Final Visits to Mr. Martin in February 2020

49.     Because of the COVID-19 pandemic, the last time the family was able to visit in person with Vince was in February. More specifically, Emma visited her husband either February 27 or 28. Emma did not observe PPE worn by any member of the staff.

50.      On or about February 29, 2020, Kathy visited her father – she also noticed the lack of PPE on the staff.

51.    Subsequently in early March 2020, Emma went to visit Vince, but she was met by an HPHC staff member who told her that the facility was not allowing visitors. Emma was distressed when she observed that that staff member did not have PPE on—that HPHC was not taking basic precautions—especially given that the facility was in lock-down.

**E.    COVID-19 Takes Hold at HPHC and HPHC Goes Into Lockdown**

52.    By the first week of March the family was told that visitors were no longer allowed in HPHC, but that family members could still bring supplies and presents to the door of the facility. During the week of March 2, Kathy brought a book and snacks to HPHC – she was met by a staff member at the door who took the items – this staff member was not wearing a mask.

53.    During March, Emma called regularly to check in on her husband.  Sometimes the staff answered, and sometimes they did not. It was a frustrating and scary time for the Martin family since they had no way of really knowing how Mr. Martin was doing day to day.

54.    On March 19, 2020, Lisa called HPHC and asked if she could mail Vince a care package of historical magazines (Mr. Martin took immense pleasure in reading) but was told that it was best not to mail anything.

**F.    Timeline of Vince Martin's Last Days**

55.    On or about Wednesday April 1, 2020, HPHC's staff called Emma Martin and said that Vince had a fever, was not eating or drinking and was confused. This was the first time that Vince's family was informed that he was sick. Emma Martin called her daughters.

56.    Later that same day, April 1, 2020, Kathy called HPHC and spoke with HPHC Director of Nursing Elizabeth Edra ("Elizabeth") to check on her father.  Elizabeth said that Mr. Martin had a fever of 100/101 degrees, was confused, was having trouble breathing, and was not eating or drinking.  **Kathy asked if any tests had been ordered for her father, but Elizabeth said nothing had been ordered.**  Kathy requested that her father undergo certain tests – including a COVID-19 test – but Elizabeth said that she'd have to get a physician to order the tests the following day.

57.     During that same conversation on April 1, 2020, Kathy also asked if there were any active COVID-19 cases at HPHC. Elizabeth reluctantly told her that there was at least one case.  Later in the conversation, Elizabeth admitted to Kathy that there were actually *four* active cases in the facility. The family was very concerned in part because HPHC is not a large facility; there is not a lot of space and the residents were packed into tight quarters. Elizabeth told Kathy that the facility was managing the situation by keeping all the COVID-19 cases on the other side of the facility from Mr. Martin.

58.     There is no record that Filart attempted to aid Mr. Martin in any meaningful way; indeed, according to Mr. Martin's medical records, Filart's only action was to give Mr. Martin oxygen 3 hours prior to his death, failing to even investigate the cause of Mr. Martin's illness. This is particularly appalling given Mr. Martin's symptoms, consistent with the COVID-19 virus, and the nationwide pandemic that has proven to be especially deadly in nursing homes much like HPHC. Had Filart shown any interest in visiting his dying patient, or in attempting to diagnose Mr. Martin's illness, it is possible Mr. Martin would still be alive today, or else would not have suffered a horrific death from COVID-19 complications. Filart, and HPHC's tacit approval of his recklessness, likely have proven to be fatal for many more residents' deaths.

59.     Unbeknownst to Mr. Martin's family, Juhn Cayabyab, the Administrator of HPHC, had been out battling COVID-19 himself since March 2020.  In other words, even after its own Administrator became infected with COVID-19, HPHC failed to take steps to protect residents and staff and failed to test its residents and staff for COVID-19.

60.     Moreover, prior to learning of Mr. Martin's symptoms on April 1, 2020, neither Lisa, Emma, nor Kathy had any clue that there were positive cases of COVID-19 at HPHC. In mid-March HPHC acknowledged that COVID-19 was spreading around the world, but assured families of residents that the risk to their loved ones was actually low. Further, HPHC promised it was making an "enormous" effort to protect residents—citing screening and work restrictions and PPE.  HPHC went into great detail about the infection control efforts it would employ. However, Mr. Martin's case clearly illustrates multiple violations of their own policies, and thus the misrepresentations made to Emma Martin were clearly fraudulent in nature.

Defendants had a motive to make these fraudulent representations, as they wanted to keep their resident beds full and continue to receive thousands of dollars per month per resident. Mr. Martin's family, and surely others, relied on the representations on HPHC in deciding to keep their loved ones at HPHC. Had they known the truth about the situation—that potential COVID-19 residents would share rooms with uninfected residents, that symptomatic residents would not be tested promptly, and that standard infection control procedures would not be followed—they would have moved Mr. Martin to a safer facility immediately.

## G.   Staff Admits to Mr. Martin's Family That There Is a Staffing Crisis: Two Nurses Were Caring for Eighty-Three Residents

61.   At about 10:00 pm on April 1, 2020, Lisa also called Elizabeth to confirm what Kathy had been told earlier. She asked to speak to her father via speakerphone, but Elizabeth said that another day would be better because, at that moment, there were only two nurses available to care for eighty-three residents. Lisa was alarmed, because she knew that there was no way that two nurses could care for eighty-three residents without transmitting COVID-19 between them. Elizabeth, sounding exhausted, told Lisa that "more staff are coming."

62.   This understaffing caused harm to both Mr. Martin and Lisa by depriving them of the last chance to speak with one another before Mr. Martin's death.

63.   Sometime on April 2, 2020, as requested by Kathy, a COVID-19 test was collected from Mr. Martin. However, the lab did not receive the test kit until April 3, at about 2:10 pm. The results would not be reported back to HPHC until the morning of April 5, 2020, the day after Mr. Martin died.

64.   Meanwhile, on April 2, 2020, at about 1:12 pm, HPHC nurse Joanne Pineda ("Joanne") attempted to contact Filart about Mr. Martin's current condition. Unfortunately, she was only able to reach Physician Assistant Joel Mandilay ("Mandilay") who told Joanne to give Mr. Martin some over-the-counter anti-diarrheal medicine. At about 2:38 pm, Joanne left a message asking Filart to call her back about Mr. Martin, but she'd have to wait over twelve hours – until 3:37 am on April 3, 2020 – for Filart to return the call. At about 3:46 pm on April 2, 2020, the LVN caring for Mr. Martin noted that he was very confused/disoriented, still

refusing to eat or drink, had a fever, and still had episodes of diarrhea—despite Mr. Martin's clearly serious and worsening condition, however, neither his physician, Filart, nor anyone at HPHC took any meaningful steps to help him.

65.     When Filart finally did call in at 3:37 am on April 3, 2020, he simply instructed Joanne to give Mr. Martin IV fluids; he did nothing to diagnose or treat Mr. Martin's underlying condition.

66.     At about 3:57 pm on April 3, 2020 – when Mr. Martin had less than twelve hours left to live – Joanne again spoke to Mandilay about a skin problem and an unstageable pressure sore on Mr. Martin's coccyx, as well as Mr. Martin's overall condition.  Mandilay ordered antibiotics for the skin wounds but did nothing else for Mr. Martin.

67.     About 5:15 pm that day, Lisa called to check on her father.  Joanne updated Lisa on her father's condition, they discussed a change in the antibiotics being given her father, and Lisa asked that her father have a urinalysis.  Joanne promptly got Mandilay to order the urinalysis, and the urine sample was collected about 9:15 pm that evening.

68.     Also, on April 3, 2020, at about 10:29 pm, (albeit by phone) Filart himself finally got involved, and ordered that Mr. Martin be given supplemental oxygen to keep his oxygen saturation above 90%.  Despite the extra oxygen, Mr. Martin passed away at 1:51 am on April 4, 2020.

69.     The funeral home picked up Vince's body two hours after Vince died. The funeral home was not told by the facility that Vince was COVID-19-positive or COVID-19-suspected, thus their staff did not know to don PPE. Upon information and belief, HPHC had a practice of bringing in outside vendors and not informing them that there was a COVID-19 outbreak.

70.     On Sunday April 5, 2020, after Vince had died, the COVID-19 positive test result came back.  Nonetheless, HPHC did not tell the family until Emma specifically called to ask on April 7, 2020.

71.     As noted above, during relevant time periods, Mr. Martin literally only interacted with HPHC staff. Thus, he could have only been infected with the COVID-19 virus by a member

of the HPHC staff, who negligently and/or recklessly failed to follow appropriate infection control measures to protect the vulnerable residents of HPHC.

72.     Mr. Martin's death certificate, issued on April 9, 2020, and certified by Dr. Marcel Filart, lists cardiac arrest, hypertension, and coronary artery disease as the cause of death. (**Exhibit 2**). Mr. Martin's COVID-19 test result was reported on April 5 before Dr. Filart signed off on the causes of death on April 9. Further, it was Dr. Filart who authorized the COVID-19 test (after Mr. Martin's family insisted on the test), so there is no doubt that he was aware that Mr. Martin had been tested and that the results would be available when he fraudulently prepared the death certificate. It was only at the insistence of Mr. Martin's family that Dr. Filart sought to amend Mr. Martin's death certificate. (**Exhibit 9**). More specifically, Dr. Filart had no intention of correcting Mr. Martin's death certificate until Lisa Gagliano insisted that it was fraudulent to leave COVID-19 off Mr. Martin's death certificate. Defendants intended to hide COVID-19 results in order to keep vital information from residents, families, staff and the government.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION: ELDER ABUSE AND NEGLECT UNDER THE ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT.

(Against All Defendants)

73.     Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

74.     At all relevant times, Vincent Paul Martin was an elder as defined by Welfare & Institutions Code section 15610.27.  He was 84 years old at the time of Defendants' conduct.

75.     The actions described above constitute abuse of an elder as defined by the Welfare and Institutions Code section 15610.07.  Defendants HPHC and Filart neglected Mr. Martin, abandoned their obligations to Mr. Martin and engaged in other mistreatment that resulted in physical harm, pain and mental suffering. Defendants HPHC and Filart, as Mr. Martin's care custodians, deprived Mr. Martin of services that were necessary to avoid physical harm and mental suffering. Defendants HPHC and Benjamin Landa failed to provide adequate funding and staffing to ensure that HPHC provided necessary care to Mr. Martin.

76.     The actions described above constitute neglect as defined by the Welfare and Institutions Code section 15610.57 in that the Defendants negligently failed to exercise a degree of care that a reasonable person in a like position would exercise.   Among other things, Defendants failed to: (1) exercise the degree of care that a reasonable person in a like position would exercise; (2) protect Mr. Martin from health and safety hazards; (3) provide necessary care and protection; (4) provide medical care for physical and mental health needs; (5) prevent malnutrition and dehydration; (6) create and update an adequate plan of care to protect Mr. Martin given the COVID-19 outbreak at HPHC; (7) provide adequate staffing levels to provide Mr. Martin with the assistance that he needed; and (8) adequately train staff to assess and respond to infectious outbreaks.   As described in this Complaint, Defendants' conduct constitutes neglect of an elder under Welfare and Institutions Code section 15610.57 (a)(1) and (b)(1)-(4).

77.     Mr. Martin has been harmed by Defendants' conduct as described herein.   The pattern of substandard care and neglect to Mr. Martin put him at extremely high risk for infections and resulting complications, including injury and death. Defendants' conduct was a substantial factor in causing Mr. Martin to suffer physical, emotional, and economic harm, as well as other damages in an amount to be determined according to proof.

78.     Defendants acted with recklessness, malice, oppression, and/or fraud.   Among other things, Defendants neglected to take the necessary precautions to prevent or treat Mr. Martin's injuries.   Plaintiffs, individually and as successors-in interest to Mr. Martin are entitled to compensatory damages, as well as punitive damages in an amount to be determined according to proof, as well as attorney's fees and costs pursuant to Welfare and Institutions Code section 15657.

79.     Defendants either personally committed acts of elder abuse or ratified the acts of elder abuse committed by their employees.

///

///

///

///

**SECOND CAUSE OF ACTION:  NEGLIGENCE**

(Against All Defendants)

80.   Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

81.   By virtue of their roles as caretakers and by virtue of the fact that Mr. Martin was a dependent adult residing at the HPHC, Defendants had a duty to exercise a degree of care that a reasonable person in a like position would exercise.  Defendants failed to do so.  Among other things Defendants had a duty to:

    a.  Adequately staff HPHC;

    b.  Ensure that each worker received adequate training before working with Mr. Martin;

    c.  Provide services that meet professional standards of quality;

    d.  Ensure that an adequate patient care plan was developed, reviewed, revised and carried out, including specifically, because Mr. Martin was exposed to COVID-19 at HPHC;

    e.  Take all reasonable and necessary precautions to ensure that Mr. Martin did not contract COVID-19;

    f.  Provide Mr. Martin with necessary tests promptly and report those results promptly;

    g.  Protect Mr. Martin from health and safety hazards;

    h.  Treat Mr. Martin with respect, dignity, and without abuse.

82.   During the period of his residency at HPHC, Defendants breached their duty to Mr. Martin.  Among other things, and without limiting the generality of the foregoing, Defendants failed to:

    a.  Adequately staff HPHC;

    b.  Ensure that each worker received adequate training before working with Mr. Martin;

    c.  Provide services that meet professional standards of quality;

d.   Ensure that an adequate patient care plan was developed, reviewed, revised and carried out, including specifically, because Mr. Martin was exposed to COVID-19 at HPHC;

e.   Take all reasonable and necessary precautions to ensure that Mr. Martin did not contract COVID-19;

f.   Protect Mr. Martin from health and safety hazards;

g.   Provide Mr. Martin with necessary tests promptly and report those results to his promptly;

h.   Treat Mr. Martin with respect, dignity, and without abuse.

83.   Defendants' negligence, carelessness, recklessness, and unlawfulness was a substantial factor in causing Mr. Martin to suffer tremendous physical, emotional, economic, and fatal harm as well as other damages to be proven at the time of the trial.

84.   As a direct and legal result of the wrongful acts and omissions of Defendant and DOES 1-50, Mr. Martin was harmed.

85.   By reason of the wrongful death of Mr. Martin that resulted from the wrongful acts and omissions of Defendants, Plaintiffs suffered and continue to suffer loss of love, companionship, comfort, affection, solace, and moral support of Mr. Martin in the amount to be determined at trial.

86.   By reason of the wrongful death of Mr. Martin, resulting from the wrongful acts and/or omissions of Defendants and DOES 1-50, and each of them, Plaintiffs hereby seek recovery of other such relief as may be just, including as provided for under the Civil Code section 377.61.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION: WRONGFUL DEATH

(Against All Defendants)

87.   Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

88.     Defendants and DOES 1-50, and each of them, negligently, carelessly, recklessly, and/or unlawfully operated HPHC so as to cause the death of Vince Martin.

89.     Defendants HPHC, Dr. Marcel Filart, Benjamin Landa and DOES 1-50 were agents, servants, employees, successors in interest, and/or joint venturers of one another, and were, as such, acting within the course, scope, and authority of said agency, employment and/or venture when they negligently, carelessly, recklessly, and/or unlawfully withheld necessary care from Vince Martin so as to cause the death of Vince Martin.

90.     As a direct and legal result of the wrongful acts and omissions of Defendants, Vince Martin died.

91.     By reason of the wrongful death of Vince Martin resulting from the wrongful acts and omissions of Defendants, and DOES 1 through 50, Plaintiffs have incurred funeral and burial expenses, and related medical expenses, in an amount to be determined at trial.

92.     By reason of the wrongful death of Vince Martin, resulting from the wrongful acts and omissions of Defendants, and DOES 1 through 50, and each of them, Plaintiffs suffered, and continue to suffer, loss of love, companionship, comfort, affection, solace and the moral and economic support of their husband and father.

93.     As a direct and legal result of the aforementioned acts of Defendants HPHC, Dr. Filart, Mr. Landa and DOES 1 through 50, inclusive, Plaintiffs, by reason of the wrongful death of Vince Martin, resulting from the wrongful acts and/or omissions of Defendants, hereby seek recovery of other such relief as may be just and provided for under Code of Civ. Proc. § 377.61.

94.     Plaintiffs are informed and believe, and thereon allege, that in the days leading up to Vince Martin's death, and continuing through his death, Defendants HPHC, Dr. Filart, Mr. Landa and DOES 1 through 50, and each of them, at all times mentioned, were under a statutory duty to comply with all applicable federal and state laws and regulations governing nursing homes in California, including but not limited to the following:

- 42 CFR §483.10(a) & (e) (respect, dignity, & without abuse);

- 42 CFR §483.21 (care plan);

- 42 CFR §483.25 (quality care must be provided; protecting for health and safety hazards);

- 42 CFR §483.30 (adequate physician oversight);
- Cal Health & Safety Code § 1279.6 (safety plan);
- Cal Health & Safety Code § 1337.1 (adequate training);
- Cal Health & Safety Code §1599.1(a) (adequate and qualified staff);
- Title 22 CCR §72311 (care plan and prompt reporting);
- Title 22 CCR §72315 (required services);
- Title 22 CCR §§72329(a) & 72501(e) (adequate staffing);
- Title 22 CCR § 72517 (adequate training);
- Title 22 CCR §72523(adequate policies and procedures);
- Title 22 CCR § 72527(a)(11) (respect, dignity, & without abuse);
- Title 22 CCR § 72537 (reporting of communicable diseases);
- Title 22 CCR § 72539 (reporting of outbreaks);
- Title 22 CCR § 72541 (reporting of unusual occurrences);
- 42 USC §1396r(b)(2) (adequate plan of care);

Defendants' violations of these laws and regulations caused or contributed to the death of Vince Martin.

95.     Vince Martin was one of the class of persons whose protection, the aforementioned laws and regulations, as well as Welfare and Institutions Code §§ 15600 *et seq.* was afforded.

96.     As a direct and legal result of the wrongful acts and omissions of Defendants, including DOES 1 through 50, and each of them, Vince Martin died.

97.     By reason of the wrongful death of Vince Martin resulting from the wrongful acts and omissions of Defendants, and DOES 1 through 50, Plaintiffs have incurred funeral and burial expenses, and related medical expenses, in an amount to be determined at trial.

98.     By reason of the wrongful death of Vince Martin, resulting from the wrongful acts and omissions of Defendants, and DOES 1 through 50, and each of them, Plaintiffs suffered, and continue to suffer, loss of love, companionship, comfort, affection, solace and the moral and economic support of their husband and father.

99.     As a direct and legal result of the aforementioned acts of Defendants HPHC. Dr. Marcel Filart, Benjamin Landa, and DOES 1 through 50, inclusive, Plaintiffs, by reason of the wrongful death of Vince Martin, resulting from the wrongful acts and/or omissions of Defendants, hereby seek recovery of other such relief as may be just and provided for under Code of Civ. Proc. § 377.61.

## FOURTH CAUSE OF ACTION: FRAUDULENT CONCEALMENT

### (Against Defendants HPHC and Marcel Filart)

100.    Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

101.    Mr. Martin was an elderly resident of the nursing home run by HPHC. Mr. Martin relied upon Defendants HPHC and Dr. Filart for his care needs.

102.    Prior to Vince Martin's death, HPHC and Dr. Filart became aware that they could not provide adequate care to Mr. Martin and knew of their duty to disclose these matters. In fact, Plaintiffs were repeatedly told that Mr. Martin was "doing ok" or words to that effect prior to April 1, 2020. Further, Plaintiffs were told that Mr. Martin would be cared for. This was untrue. By March 2020, Defendants HPHC and Dr. Filart knew that there was an outbreak of COVID-19 at HPHC, yet they kept the fact of the outbreak and the severity of the outbreak concealed.

103.    When a member of HPHC's staff eventually told Plaintiffs that there were one or more COVID-19 cases at HPHC, they intentionally failed to disclose the full extent of the outbreak, making the disclosure deceptive.

104.    Defendants intentionally failed to disclose, first the fact that there was COVID-19 in the facility, then that there was a serious outbreak of COVID-19, and then that Mr. Martin had been exposed to COVID-19, then that Mr. Martin was likely COVID-19 positive. These facts were known only to Defendants and are not facts that Plaintiffs could have discovered. Plaintiffs did not learn that Mr. Martin was COVID-19 positive until after his death. Even after the COVID-19 positive test, Defendants HPHC and Dr. Filart concealed that Mr. Martin's

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1    death was caused by COVID-19—instead, COVID-19 was left off of Mr. Martin's death

2    certificate.

3        105.   Defendants HPHC and Dr. Filart breached their duties to disclose these facts to

4    Plaintiffs and engaged in the above-listed concealments and misrepresentations with the

5    intention of deceiving and misleading Plaintiffs.

6        106.   Had the omitted information been disclosed, Plaintiffs would have behaved

7    differently, including that they would have insisted that Mr. Martin receive a COVID-19 test

8    earlier and that he be treated for COVID-19.

9        107.   Mr. Martin was injured and died as a result of Defendants HPHC's and Dr.

10   Filart's acts of misrepresentation and concealment. Plaintiffs also sustained damages and/or

11   injuries, including emotional distress.

12           **FIFTH CAUSE OF ACTION: FRAUDULENT MISREPRESENTATION**

13               (Against Defendants HPHC and Marcel Filart)

14       108.   Plaintiffs incorporate by reference and re-allege all of the allegations contained in

15   the preceding paragraphs of this Complaint as though fully set forth herein.

16       109.   Mr. Martin was an elderly resident of the nursing home run by HPHC. Mr.

17   Martin relied upon Defendant HPHC and its staff for his care needs.

18       110.   HPHC and its staff repeatedly represented to Plaintiffs that Mr. Martin was

19   "doing ok" or words to that effect during the lockdown prior to April 1, 2020. Further, HPHC

20   and its staff represented to Plaintiffs that Mr. Martin would be cared for. This was untrue.

21       111.   HPHC and its staff told Plaintiffs that there were less COVID-19 cases in the

22   facility than there really were. HPHC and its staff further assured Plaintiffs that all COVID-19

23   positive residents were placed in a separate part of the nursing home from Mr. Martin, which

24   was not correct.

25       112.   Dr. Marcel Filart misrepresented the cause of Mr. Martin's death on Mr. Martin's

26   death certificate dated April 9, 2020, as cardiorespiratory arrest, essential hypertension and

27   coronary artery disease, hiding Mr. Martin's COVID-19 positive result and the real cause of

28   death.

113.   HPHC and its staff falsely claimed that labs were completed when they were not in fact done.

114.   HPHC and its staff falsely claimed that Mr. Martin could not be transferred to a hospital for care in the days leading up to his death, that he would unlikely be accepted, and would be harmed.

115.   Defendants HPHC and Dr. Filart breached their duties to disclose true facts to Plaintiffs and engaged in the above-listed misrepresentations with the intention of deceiving and defrauding Plaintiffs.  Defendants HPHC and Dr. Filart knew that these representations were false when they made them or made the representations recklessly and without regard for its truth.  Defendants intended that Plaintiffs rely on these representations to hide what harm Mr. Martin was suffering.  Plaintiffs reasonably relied on Defendants' representations, and Mr. Martin was thus injured and harmed.  Plaintiffs' reliance on HPHC and Dr. Filart's representations was a substantial factor in causing Mr. Martin's death.

116.   Had the omitted information been disclosed, Plaintiffs would have behaved differently, including that they would have insisted that Mr. Martin receive a COVID-19 test earlier and that he be treated for COVID-19.

117.   Mr. Martin was harmed and died as a result of Defendants HPHC's and Dr. Filart's acts of misrepresentation. Plaintiffs also sustained damages and injuries, including emotional distress.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Emma Martin, Elizabeth Gagliano and Kathy Sessinghaus pray for relief as follows:

1.   General and special compensatory damages according to proof;

2.   Punitive damages according to proof, including treble punitive damages per Civil Code section 3345;

3.   For prejudgment and post-judgment interest upon such judgment at the maximum rate provided by law;

4.      Reasonable costs of suit;

5.      Attorney's fees and costs per Welfare and Institutions Code section 15657; and

6.      Such other further relief as the Court may deem proper.

Dated:  August 24, 2020                    **COTCHETT, PITRE & McCARTHY, LLP**


By: _____*/s/ Anne Marie Murphy*_____
     ANNE MARIE MURPHY
     *Attorneys for Plaintiffs*


## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.


Dated:  August 24, 2020                    **COTCHETT, PITRE & McCARTHY, LLP**


By: _____*/s/ Anne Marie Murphy*_____
     ANNE MARIE MURPHY
     *Attorneys for Plaintiffs*

# Exhibit 1



**Hollywood Premier
Healthcare Center**
5401 Fountain Ave,
Los Angeles, CA 90029
323.465.2106

May 19, 2020

To Our Residents and Family Members:

We want to inform you that at **Hollywood Premier Healthcare Center**, we have **87** confirmed cases of COVID-19. (Please note that Hollywood Premier has been designated as a Dedicated Covid-19 Facility by the Los Angeles County Dept. of Public Health and is currently only accepting confirmed Covid-19 patients).

The safety and wellbeing of our residents is our top priority. We are doing what we can to limit the spread of COVID-19 within **Hollywood Premier Healthcare Center**, including staying in very close communication with local and state health officials to ensure we are taking all the appropriate steps under current circumstances.

We are taking steps based on guidance from the Centers for Disease Control and Prevention (CDC) and the Center for Medicare and Medicaid Services (CMS) to reduce the spread and impact of COVID-19, such as:

- Enhanced infection control precautions
- Screening residents, staff, and essential visitors for an expanded list of symptoms
- Restricting visitation and entry of people to the building
- Testing staff and residents for COVID-19 based on current protocols and availability of tests
- Postponing communal activities

Due to government privacy requirements, we cannot divulge specific information about the individuals who have confirmed or suspected COVID-19, unless they are your family member and you have the necessary permissions to receive such information.

We know you are concerned about your loved one, but it is crucial that we restrict visitation to reduce the spread of this virus to others. We will contact you directly if your loved one is suspected or diagnosed with COVID-19.

We also understand that connecting with family members is incredibly important to our residents. Family members are encouraged to connect with their loved ones through video chat, calling, texting, or on social media. Hollywood Premier has implemented a Zoom Video Conferencing System that is available for our residents and their loved ones.

We need your help in battling COVID-19. Please visit the CDC website (www.cdc.gov/coronavirus) to learn how you can help prevent the spread in our community, since continued spread in the larger community increases the chance the virus will work its way into our building.

This is a difficult time for everyone. We will continue to provide you with updates. Please know that we are adhering to guidelines from the local and state health departments, which continue to evolve as we learn more about this virus.

We know that you may have questions and we encourage you to contact our center. Please call us at **323-465-2106**, email us at socialservices@serranopostacute.com, or visit our website for updates on the status of your loved one.

Sincerely, **Hollywood Premier Healthcare Center**



**Hollywood Premier
Healthcare Center**
5401 Fountain Ave,
Los Angeles, CA 90029
323.465.2106

May 14, 2020


To Our Residents and Family Members:

We want to inform you that **at Hollywood Premier Healthcare Center**, we have 81 confirmed cases of COVID-19. (Please note that Hollywood Premier has been designated as a Dedicated Covid-19 Facility by the Los Angeles County Dept. of Public Health and is currently only accepting confirmed Covid-19 patients).

The safety and wellbeing of our residents is our top priority. We are doing what we can to limit the spread of COVID-19 within **Hollywood Premier Healthcare Center**, including staying in very close communication with local and state health officials to ensure we are taking all the appropriate steps under current circumstances.

We are taking steps based on guidance from the Centers for Disease Control and Prevention (CDC) and the Center for Medicare and Medicaid Services (CMS) to reduce the spread and impact of COVID-19, such as:

- Enhanced infection control precautions
- Screening residents, staff, and essential visitors for an expanded list of symptoms
- Restricting visitation and entry of people to the building
- Testing staff and residents for COVID-19 based on current protocols and availability of tests
- Postponing communal activities

Due to government privacy requirements, we cannot divulge specific information about the individuals who have confirmed or suspected COVID-19, unless they are your family member and you have the necessary permissions to receive such information.

We know you are concerned about your loved one, but it is crucial that we restrict visitation to reduce the spread of this virus to others. We will contact you directly if your loved one is suspected or diagnosed with COVID-19.

We also understand that connecting with family members is incredibly important to our residents. Family members are encouraged to connect with their loved ones through video chat, calling, texting, or on social media. Hollywood Premier has implemented a Zoom Video Conferencing System that is available for our residents and their loved ones.

We need your help in battling COVID-19. Please visit the CDC website (www.cdc.gov/coronavirus) to learn how you can help prevent the spread in our community, since continued spread in the larger community increases the chance the virus will work its way into our building.

This is a difficult time for everyone. We will continue to provide you with updates. Please know that we are adhering to guidelines from the local and state health departments, which continue to evolve as we learn more about this virus.

We know that you may have questions and we encourage you to contact our center. Please call us at **323-465-2106**, email us at socialservices@serranopostacute.com, or visit our website for updates on the status of your loved one.


Sincerely, **Hollywood Premier Healthcare Center**

# Exhibit 2

# Registered Envelope Service

### Death Certificate amendment

GA  **Glen Arnold <garnold@vitalhealthmed.com>**
05/06/2020 08:06:43 PM GMT
To:    coviddeath@ph.lacounte.gov
CC:    garnold@vitalhealthmed.com

Dear Madam. It was brought to our attention the need for a medical amendment to the death certifica
te of Mr. Vincent Martin ( DOB 08/31/1935 ). After receiving and reviewing laboratory results reporte
d on 04/05/2020 it is pertinent to amend and add COVID-19 as a cause of death. Please feel free t
o reach out to me at any time if you need any further assistance. Thank you.
Regards;

Glen Arnold
Administrator
Marcel Filart MD
Vital Health Medical Group
1711 W. Tempe St.
Los Angeles  CA. 90026
Mobile (323)794-4383
eFax    (323)488-9294

# Exhibit 3

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER / SUPPLIER / CLIA IDENNTIFICATION NUMBER | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 056489 | | 02/25/2019 |

| NAME OF PROVIDER OF SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP |
|---|---|
| HOLLYWOOD PREMIER HEALTHCARE CENTER | 5401 FOUNTAIN AVE. LOS ANGELES, CA 90029 |

For information on the nursing home's plan to correct this deficiency, please contact the nursing home or the state survey agency.

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) |
|---|---|
| F 0558<br><br>Level of harm - Minimal harm or potential for actual harm<br><br>Residents Affected - Few | Reasonably accommodate the needs and preferences of each resident.<br>**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**<br>Based on observation, interview, and record review, the facility failed to accommodate the needs of two of 18 sampled residents (Resident 24 and 19).<br>a. For Resident 24, the facility failed to ensure the resident's wheelchair was able to fit through the activities room doors for the resident to attend the group activities in the activities room. This deficient practice resulted in the resident feeling not being able to participate in the activities and socialize with other residents.<br>b. For Resident 19, the facility failed to place the resident's call light within the resident's reach. As a result, the resident was not able to reach the call light when the resident required assistance from the staff.<br>Findings:<br>a. A review of Resident 24's Admission Record indicated the resident was admitted to the facility on [DATE] and was readmitted on [DATE]. Resident 24's [DIAGNOSES REDACTED].<br>A review of the Minimum Data Set (MDS- a standardized assessment and care planning tool) dated 12/12/18, indicated that Resident 24 had no cognitive impairment (the mental action or process of acquiring knowledge and understanding through thought, experience, and the senses) and required extensive assistance with one-person assist from staff for bed mobility, toilet use, personal hygiene and dressing.<br>On 2/19/19, at 3:31 p.m., during an observation and a concurrent interview, Resident 24 was in a wheelchair, outside the activities room. Resident 24 was looking into the activities room through the open door. Resident 24 stated, she would like to participate in the activities with the other residents. She would like to play bingo, participate in bible study, and socialize with the other residents in the activity room. Resident 24 stated, unfortunately, her wheel chair was too wide and does not fit through the activities room door. Resident 24 stated, the only activities she does was in her room. She attends bible study by sitting in her wheel chair out in the hallway. Resident 24 complained of being bored and usually spends her time in the wheelchair in the hallway.<br>On 2/25/19, at 9:30 a.m., during an interview, the Activities Director (AD) stated, Resident 24 used to attend the activities in the activities room every day. However, the resident was provided with a new wheelchair more appropriate to the resident and now the wheelchair is too wide to fit through the door of the activity room. The AD stated, if the resident likes the activities going on in the activities room, she would sit outside by the door. The AD stated, it would be better for the resident to be inside the activities room and be able to actively participate in the activities. The AD stated, Resident 24 liked to socialize with the other residents in the activity room but was unable to now because her wheelchair will not fit through the doors.<br>A review of the facility policy and procedures titled, Quality of Life- Accommodation of Needs, revised 8/2009, indicated in order to accommodate individual needs and preferences, adaptations may be made to the physical environment, including the resident's bedroom and bathroom, as well as the common areas in the facility.<br>b. A review of Resident 19's Admission Record indicated the resident was admitted to the facility on [DATE] and was readmitted on [DATE]. Resident 19's [DIAGNOSES REDACTED].<br>A review of the MDS dated [DATE], indicated the Resident 19 had mild memory and cognitive impairment and required extensive assistance with one-person assistance for bed mobility, dressing, and eating. The MDS indicated Resident 19 was total dependent on the staff with one-person assistance with transfers, locomotion on the unit- how the resident moves to and returns from off unit locations, toilet use, and personal hygiene.<br>A review of Resident 19's Care Plan, dated 10/23/18, indicated the resident was at high risk for falls. Proposed interventions included to be sure the resident's call light was within reach and to encourage the resident to use it for assistance as needed.<br>On 2/19/19, at 3:20 p.m., during an observation and concurrent interview, Resident 19 was heard yelling help, help me, from his room. There was no staff present in the area at the time. Upon entering the resident's room, Resident 19 was observed lying in bed with bilateral side rails up. Resident 19's call light cord was observed wrap around the right side rail. Resident 19 was unable to reach the call light. Resident 19 stated, he was unable to reach the call light control.<br>On 2/19/19, at 3:25 p.m., during an observation and concurrent interview, Registered Nurse 3 (RN 3) stated, the call light was too far away from the resident and the resident could not reach it. RN 3 stated, the call light should be within the resident's reach. It was important that the resident could reach it in case of an emergency or when the resident needed help.<br>A review of the facility policy and procedures titled, Answering the Call Light, revised 10/2010, indicated that when a resident is in bed or confined to a chair, to be sure the call light was within easy reach of the resident. |
| F 0604<br><br>Level of harm - Minimal harm or potential for actual harm<br><br>Residents Affected - Few | Ensure that each resident is free from the use of physical restraints, unless needed for medical treatment.<br>**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**<br>Based on observation, interview, and record review, for one of three sampled residents (Resident 61) with physical restraint (any manual method, physical or mechanical device, equipment, or material that is attached or adjacent to the resident's body, cannot be removed easily by the resident and restricts the resident's freedom of movement or normal access to his/her body) in a total resident sample of 18, the facility failed to ensure the resident attained and maintained his highest practicable well-being in an environment that prohibits the use of physical restraints to unnecessarily inhibit a resident's freedom of movement or activity.<br>This deficient practice has the potential for the resident declining in physical functioning, injury from attempts to free himself from the restrain and accidents such as falls, strangulation or entrapment.<br>Findings:<br>A review of Resident 61's Admission Record indicated Resident 61 was admitted on [DATE]. Resident 61's [DIAGNOSES REDACTED]. to perform everyday activities) without behavioral disturbance.<br>A review of Resident 61's Minimum Data Set (a standardized, primary screening and assessment tool of health status which forms the foundation of the comprehensive assessment for all residents of long term care facilities) dated 1/31/19, indicated Resident 61 was moderately cognitively impaired (the mental action or process of acquiring knowledge and understanding through thought, experience, and the senses) and used a trunk restraint daily.<br>A review of Resident 61's physician's orders [REDACTED].<br>A review of Resident 61's care plan dated did not include any care plan regarding the alternative methods used before put |

| LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE | (X6) DATE |
|---|---|---|

Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide sufficient protection to the patients. (See instructions.) Except for nursing homes, the findings stated above are disclosable 90 days following the date of survey whether or not a plan of correction is provided. For nursing homes, the above findings and plans of correction are disclosable 14 days following the date these documents are made available to the facility. If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 05/16/2019
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER / SUPPLIER / CLIA IDENNTIFICATION NUMBER 056489 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 02/25/2019 |
|---|---|---|---|

| NAME OF PROVIDER OF SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP |
|---|---|
| HOLLYWOOD PREMIER HEALTHCARE CENTER | 5401 FOUNTAIN AVE. LOS ANGELES, CA 90029 |

For information on the nursing home's plan to correct this deficiency, please contact the nursing home or the state survey agency.

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) |
|---|---|
| F 0604 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | (continued... from page 1) the resident on physical restraint. On 2/25/19, at 1:02 p.m., during an observation and concurrent interview, Resident 61 was sitting in a wheelchair with a family member (FAM 1) next to him. FAM 1 stated, Resident 61 used the Posey belt restraint whenever up in a chair, when FAM 1 was not present. FAM 1 stated, the resident sometimes slipped to ground even with the Posey belt was on him. A review of Resident 61's progress notes dated from 7/13/18 to 8/17/18, no documentation was found that indicated the facility tried to use less restrictive methods before using the Posey belt restraint. During an interview on 2/25/18, at 1:02 p.m., Registered Nurse 1 (RN 1) stated, the Posey belt restraint was applied to Resident 61 when he was up in the chair or out of bed. RN 1 confirmed, there was no documentation in progress notes that less restrictive alternative methods were attempted before the Posey belt restraint was ordered. |
| F 0641 Level of harm - Potential for minimal harm Residents Affected - Some | Ensure each resident receives an accurate assessment. **NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY** Based on observation, interview, and record review, the facility failed to ensure the accuracy of the Minimum Data Set (MDS), a comprehensive health status assessment tool, for one of 18 sampled residents (Resident 73). This deficient practice had the potential to result in inappropriate billing and quality of care deficiencies. Findings: A review of Resident 73's Admission Record indicated the resident was admitted on [DATE], with [DIAGNOSES REDACTED]. A review of Resident 73's physician's orders [REDACTED]. On 2/21/19, during an observation and concurrent interview, Resident 73 was in bed and had an open hole at the front of the neck covered with a loose gauze. Resident 73 stated, it was a [MEDICAL CONDITION]. A review of Resident 73's MDS dated [DATE], did not indicate that the resident had a [MEDICAL CONDITION]. During an interview, on 2/25/19, at 1:38 p.m., Registered Nurse 2/MDS Nurse stated, she did not accurately code Resident 73's [MEDICAL CONDITION] status on the MDS. |
| F 0656 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | Develop and implement a complete care plan that meets all the resident's needs, with timetables and actions that can be measured. **NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY** Based on observation, interview, and record review, the facility failed to ensure a specific care plan was developed and implemented for two (Resident 34 and 67) of 18 sampled residents. a. For Resident 34, facility failed to develop a care plan specific for the risk of entrapment related to the use of bed side rails. This deficient practice had the potential risk for the resident to get caught between the mattress and side rails or in the side rail itself. b. For Resident 67, facility failed to develop a care plan for the resident's behavior of constantly worrying about his personal items being taken away from him and getting lost. This deficient practice had the potential risk for resident's health and well being to decline. Findings: a. A review of Resident 34's Admission Record indicated the resident was originally admitted to the facility on [DATE] and readmitted on [DATE], with [DIAGNOSES REDACTED]. enough blood) affecting the right dominant side. A review of Resident 34's Minimum Data Set (MDS, a standardized assessment and care screening tool), dated 1/1/18, indicated Resident 34 had the ability to make self understood and understand others. The MDS further indicated, Resident 34 was totally dependent on staff for transfer to and from bed, eating, toilet use, personal hygiene, and bathing, and required extensive assistance from staff for dressing and bed mobility. A review of the summary of Resident 34's physician's orders indicated an order, dated 2/24/18, to apply on the right side full side rail and the left side 1/2 side rail on resident's bed for mobility and poor safety awareness. During an observation, on 2/25/19, at 11:35 a.m., Resident 34 was observed laying in bed with 1/2 side rail up on the left side of his bed. A review of a care plan for Resident 34, dated 6/30/17, for complications related to the use of the side rails, indicated goal was for resident to remain free of injury, falls, or accidents, and for resident to remain free of complications related to the use of the side rails. The list of interventions, however, did not include assessment of the resident for the risk of entrapment related to the use of the side rails. A review of another care plan for the use of side rails for Resident 34, dated 2/24/18, indicated goal was to prevent decrease functioning and immobility, and reduce risk for development of skin alteration. The interventions listed, however, did not include assessment of the resident for the risk of entrapment. During an interview and concurrent record review, on 2/25/19, at 2:09 p.m., the Director of Nurses (DON) confirmed, the side rail assessment does not include assessment for the risk of entrapment and that the care plans does not address the risk for entrapment. The DON stated, the facility does not have an assessment specifically for the risk of entrapment for the use of the side rail. A review of the facility policy and procedure, revised 10/2010, titled, Proper Use of Side Rails, indicated: The purpose of the guideline was to ensure the safe use of side rails. The policy indicated that an assessment will be made to determine the resident's symptoms and reason for using the side rails. The policy, however, did not indicate that the risk for entrapment will be include in the assessment and a care plan will be developed as a result of this assessment. b. A review of the Admission Record indicated Resident 67 was admitted to the facility on [DATE], with [DIAGNOSES REDACTED]. A review of Resident 67's MDS dated [DATE], indicated resident had the ability to make self understood and understand others. The MDS further indicated that Resident 67 required limited assistance form staff for most of his activities for daily living (bed mobility; transfer to and from bed; locomotion on and off the unit; and personal hygiene), and extensive staff assistance for dressing, toilet use, and bathing. During an interview, on 2/21/19, at 1:24 p.m., Resident 67 stated, he felt the staff are taking his stuff, his paperwork, and sometimes clothing. He stated, sometimes he does not want to leave the room and keeps telling the staff that he is missing items. But no one pays attention to him. He further stated, he does not like it because his things are important to him. During an interview, on 2/21/19, at 2:11 p.m., the Social Services Designee (SSD) stated, Resident 67 was afraid about someone taking his belongings. She stated Resident 67 does not want to leave his room and sometimes refuses to be washed due to his fear. She stated he claimed he was missing items but nothing specific, he just said that someone took his things. The SSD further stated, she issue with missing items was not care planned. The SSD stated, it should have been care planned that he was fabricating that he was missing clothes. The SSD stated, it was important so staff will know what to do, just in case something like this happens again. During an interview, on 2/21/19, at 2:55 p.m., the Registered Nursing Supervisor (RN 1) stated, Resident 67 was paranoid of them touching his clothes. RN 1 stated, the resident does not want them to touch anything because he was paranoid of his belongings being lost. RN 1 stated, Resident 67 gets upset and thinks everyone was taking his items/things from him. RN 1 further stated, the paranoid behavior should have been addressed and care planned in order for the staff to address the issue with possible interventions and monitor him and other interventions to address his issues, like no-one will touch his belongings. A review of the documented care plans for Resident 67, no care plan had been developed for the resident's behavior of constantly worrying about his personal items being taken away from him and getting lost. |
| F 0675 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | Honor each resident's preferences, choices, values and beliefs. **NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY** Based on observation, interview, and record review, the facility failed to provide the necessary care and services for one of 18 sampled resident (Resident 67). Resident 67 was wearing a pair of eyeglasses that was broken and not in good repair. This had the potential for resident's physical and psychosocial well being to decline. Findings: |

FORM CMS-2567(02-99)
Previous Versions Obsolete

Event ID: YL1O11

Facility ID: 056489

If continuation sheet
Page 2 of 5

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 05/01/2019
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER / SUPPLIER / CLIA IDENNTIFICATION NUMBER 056489 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 02/25/2019 |
|---|---|---|---|

| NAME OF PROVIDER OF SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP |
|---|---|
| HOLLYWOOD PREMIER HEALTHCARE CENTER | 5401 FOUNTAIN AVE. LOS ANGELES, CA 90029 |

For information on the nursing home's plan to correct this deficiency, please contact the nursing home or the state survey agency.

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) |
|---|---|
| F 0675 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | (continued... from page 2) A review of the Admission Record indicated Resident 67 was admitted to the facility on [DATE], with [DIAGNOSES REDACTED]. A review of Resident 67's Minimum Data Set (MDS, a standardized assessment and care screening tool), dated 1/24/19, indicated resident had the ability to make self understood and understand others. The MDS further indicated that Resident 67 required limited assistance from staff for most of his activities for daily living (bed mobility; transfer to and from bed; locomotion on and off the unit; and personal hygiene), and extensive staff assistance for dressing, toilet use, and bathing. During an observation and concurrent interview, on 2/21/19, at 1:24 p.m., Resident 67 was observed wearing eyeglasses that were broken. The frame of the eyeglasses had a transparent tape on the right side and a duct tape (gray industrial tape) on the left side. The eyeglass lenses were angled towards the resident's eyes. Resident 67 stated, My eyeglasses had been like this for a while. They gave me some eyeglasses, but they are not mine. I have to walk around with tape on my broken eyeglasses. I don't like it and makes me feel shy, you know. During an interview, on 2/21/19, at 2:11 p.m., the Social Services Designee (SSD) stated, the resident has an appointment with an optometrist but did not document it. A review of the facility policy and procedure, revised 8/2009, titled, Quality of Life-Accommodation of Needs, indicated, the staff shall help to keep hearing aids, glasses and other adaptive devices clean and in working order for the resident. |
| F 0692 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | Provide enough food/fluids to maintain a resident's health. **NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY** Based on observation, interview, and record review, the facility failed to follow the resident's food preference and did not follow the facility policy to place a diet card on each tray for one of 18 sampled residents (Resident 71). This deficient practice had the potential for the resident not to maintain sufficient intake for proper hydration. Findings: A review of Resident 71's Admission Record indicated the resident was admitted on [DATE], with [DIAGNOSES REDACTED]. A review of Resident 71's Minimum Data Set (MDS, a standardized assessment and care screening tool), dated 12/14/18, indicated the resident had clear speech, can make herself understood and understood others, and was cognitively intact (the mental action or process of acquiring knowledge and understanding through thought, experience, and the senses). During an observation and concurrent interview, on 2/20/19, at 10:03 a.m., a breakfast tray was observed in Resident 71's room. The tray had no diet card and the tray had scrambled eggs, two pieces of bread, a glass of juice and a glass of milk. The food on the tray was untouched. Resident 71 stated, she does not like the breakfast food, especially eggs. She had asked for a fruit plate for breakfast but never received it. Resident 71 stated, she had talked to the nurse a few times but nobody took care of it. Licensed Vocational Nurse 2 (LVN 2) stated, normally the certified nurse assistants (CNAs) passes the trays and collects the trays after meals. LVN 2 confirmed, that there was no diet card on Resident 71's breakfast tray. LVN 2 stated, there should be a diet card on every tray. During an observation and a concurrent interview on 2/20/19, at 12:45 p.m., Resident 71's lunch tray included a chicken sandwich with cheese, cottage cheese, and a green salad. Resident 71 stated, she does not like cheese. Resident 71's diet card on the tray indicated, no pork, beef, rice, potatoes and cheese. LVN 1 confirmed Resident 71's lunch tray had cottage cheese and slices of cheese inside the sandwich. During an interview, on 2/25/19, at 12:16 p.m., the Dietary Supervisor (DS) stated, the facility uses a diet communicate form. When the resident requested a diet preference change, then we prepared the meal according to the request form and reflect the preference on the diet card. The DS stated, every tray should have a diet card. A review of the facility policy and procedure titled, Tray Identification. dated 1/10/19, indicated, use the diet card to assist in setting up and serving correct food trays/diets to residents, the food service manager or supervisor will check trays for correct diets before the food carts are transported to their designated area and nursing staff shall check each tray for the correct diet before serving the residents. |
| F 0693 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | Ensure that feeding tubes are not used unless there is a medical reason and the resident agrees; and provide appropriate care for a resident with a feeding tube. **NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY** Based on observation, interview, and record review, the facility failed to ensure one of two sampled residents (Resident 50) with a gastrostomy tube (G tube-tube surgically inserted into the stomach for administration of nutrients and medications) in a total resident sample of 18, received appropriate treatment and services to ensure adequate intake and aspiration pneumonia (a condition in which food, liquids, saliva, or vomit is breathed into the airway causing an infection in the lungs). Resident 50 head of the bed was not properly elevated to prevent the development of aspiration pneumonia. The staff was unable to determine how long the tube feeding had been running the amount of tube feeding the resident had. These deficient practices had the potential for the Resident 50 not receiving the ordered amount of nutrients and the potential for developing aspiration pneumonia. Findings: A review of Resident 50's Admission Record indicated that the resident was readmitted on [DATE], with [DIAGNOSES REDACTED]. A review of Resident 50's physician order dated 5/16/18, indicated: a. Enteral (refers to any method of feeding that uses the gastrointestinal (GI) tract to deliver part or all of a person's caloric requirements) feed order: Fibersource HN (type of feeding formula) at 65 milliliters (ml)/hour (hr) for 20 hrs to provide 1300 ml/1560 kilocalories via feeding pump. b. Enteral feed order: Every shift elevate head of the bed (HOB) 30-45 degrees at all times. A review of Resident 50's care plan dated 5/16/18, indicated: elevate head of bed 30-45 degrees. During an observation and a concurrent interview on 2/22/19, at 9:02 a.m., Resident 50 was observed lying flat in bed. The enteral feeding pump was running at 65 ml/hr with Fibersource HN, which was dated 2/22/19, at 5 a.m. Licensed Vocational Nurse 3 (LVN 3) stated, the pump showed total volume administered was 519 ml. LVN 3 stated, she did not know what that number meant and did not know when the feeding started. LVN 3 stated, whoever set up the tube feeding will set the total amount of feeding according to physician order and when the pump hits the set up limit, it will stop. LVN 3 stated there was no documentation of the start time for the 519 ml began to infuse or how much was administered during each shift. LVN 3 elevated the head of bed for Resident 50. LVN 3 stated, the head of bed should be elevated all the time when tube feeding was on for aspiration precaution. RN 1 stated that the person changing feeding bag should be the one document the amount of enteral feeding given to the resident. During an interview on 2/22/19, at 2:07 p.m., Registered Nurse 1 (RN 1) confirmed nothing was documented in Resident 50's progress notes or Medication Administration Record [REDACTED]. RN 1 stated, the person changing feeding bag should document the amount of enteral feeding given to the resident. RN 1 stated, the head of the bed should always be elevated when the resident feeding is on. A review of the facility policy and procedure titled, Enteral Tube Feeding via Continuous Pump, dated 1/10/19, indicated: Position the head of the bed at 30-45 degrees for feeding and the person performing the tube feeding record information in the resident's medical record amount and types of enteral feeding. |
| F 0700 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | Try different approaches before using a bed rail. If a bed rail is needed, the facility must (1) assess a resident for safety risk; (2) review these risks and benefits with the resident/representative; (3) get informed consent; and (4) Correctly install and maintain the bed rail. **NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY** Based on observation, interview, and record review, the facility failed to ensure one of two sampled residents (Resident 34) |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: [REDACTED]
FORM APPROVED
OMB No. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER / SUPPLIER / CLIA IDENNTIFICATION NUMBER: 056489 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 02/25/2019 |
|---|---|---|---|

| NAME OF PROVIDER OF SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP |
|---|---|
| HOLLYWOOD PREMIER HEALTHCARE CENTER | 5401 FOUNTAIN AVE. LOS ANGELES, CA 90029 |

For information on the nursing home's plan to correct this deficiency, please contact the nursing home or the state survey agency.

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) |
|---|---|
| F 0700 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | (continued... from page 3) reviewed for the use of bed rails (side rails) in a total resident sample of 18, were assessed for the risk of entrapment. Residents 34 was not assessed for the risk of entrapment before using the side rails. This deficient practice had the potential risk for these residents to get caught between the mattress and side rails or in the side rail itself. Findings: A review of Resident 34's Admission Record indicated the resident was originally admitted to the facility on [DATE] and readmitted on [DATE], with [DIAGNOSES REDACTED]. enough blood) affecting the right dominant side. A review of Resident 55's Minimum Data Set (MDS, a standardized assessment and care screening tool), dated 1/11/18, indicated resident had the ability to make self understood and understand others. The MDS further indicated that Resident 34 was totally dependent on staff for transfer to and from bed, eating, toilet use, personal hygiene, and bathing, and required extensive assistance form staff for dressing and bed mobility. A review of the summary of Resident 34's physician's orders indicated an order, dated 2/24/18, to apply on the right side full side rail and the left side 1/2 side rail on resident's bed the for mobility and poor safety awareness. During an observation, on 2/25/19, at 11:35 a.m., Resident 34 was observed laying in bed with 1/2 side rail up on the the left side of his bed. A review of a care plan for Resident 34, dated 6/30/17, for complications related to the use of the side rails, indicated goal was for resident to remain free of injury, falls, or accidents, and for resident to remain free of complications related to the use of the side rails. The list of interventions, however, did not include assessment of the resident for the risk of entrapment related to the use of the side rails. A review of another care plan for the use of side rails for Resident 34, dated 2/24/18, indicated goal was to prevent decrease functioning and immobility, and reduce risk for development of skin alteration. The interventions listed, however, did not include assessment of the resident for the risk of entrapment. A review of Resident 34's initial assessment for the use of the side rails, dated 2/24/18, does not indicate that the resident was assessed for the risk of entrapment. During an interview and concurrent record review, on 2/25/19, at 2:09 p.m., the Director of Nurses (DON) confirmed, the side rail assessment does not include assessment for the risk of entrapment and that the care plans does not address the risk for entrapment. The DON stated, that they don't have an assessment specifically for the risk of entrapment for the use of the side rail. A review of the facility policy and procedure, revised on 10/2010, for the use of side rails indicated that the purpose of the guideline was to ensure the safe use of side rails. The policy indicated that an assessment will be made to determine the resident's symptoms and reason for using the side rails. The policy, however, did not indicate that the risk for entrapment will be included in the assessment. |
| F 0732 Level of harm - Potential for minimal harm Residents Affected - Some | Post nurse staffing information every day. Based on observation, interview, and record review, the facility failed to ensure the Daily Staffing was posted and readily available to residents and visitors at any given time. This deficient practice failed to make the Daily Staffing readily available to residents and visitors. Findings: On 2/25/19, at 10:02 a.m., during an observation and concurrent interview, the Daily Staffing Posting could not be located in a prominent place, such as the main entrance to the facility or the hallways by Nurses Station 1 and 2. Registered Nurse 1 (RN 1) stated, the Daily Staffing Posting was located in a three ring binder among other folders on the counter of Nursing Station 1. According to RN 1, the Daily Staffing binder used to be posted by the wall on the hallway by Nursing Station 1 but the place/stand where it was located broke and now it is kept by the counter on Nurses Station 1. On 2/25/18, at 11 a.m., during an interview, the Director of Nursing (DON) stated, the Daily Staffing should be posted on the wall of the main hallway to be seen by everyone, residents and visitors. |
| F 0865 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | Have a plan that describes the process for conducting QAPI and QAA activities. Based on interview and record review, the facility failed to evaluate the effectiveness of its quality assurance and performance improvement (QAPI) program per the facility policy and procedures. This deficient practice prevents quality care improvement based on QAPI Program performance evaluation. Findings: On 2/25/19, at 3:04 p.m., during a review of the facility QAPI plan and concurrent interview, the Administrator (ADM) stated, the performance of the QAPI plan was not evaluated yet. According to ADM, it was important to do it because it will aid in quality care improvements based on QAPI performance. According to the ADM if evaluated, the quality of care at the facility will improve. A review of the facility policy and procedures titled, Quality Assurance and Performance Improvement (QAPI) Plan, revised 4/2014, indicated that the facility shall evaluate the effectiveness of its QAPI Program at least annually and shall present their conclusions to the owner/governing board for review. |
| F 0880 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | Provide and implement an infection prevention and control program. **NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY** Based on observation, interview, and record review, the facility failed to ensure the infection control protocol was followed for two of 18 sampled residents (Residents 79 and 55). a. For Resident 79, the facility failed to ensure used resident equipment was removed and cleaned. This deficient practice had the potential to spread infection and transmission of communicable diseases. b. For Resident 55, the facility failed to label the oxygen tubing (a plastic flexible tubing that delivers oxygen) with the resident's name and date. This deficient practice had the potential to result in an infection to the resident. Findings: a. A review of Resident 79's Admission Record indicated the resident was re-admitted on [DATE], with [DIAGNOSES REDACTED]. A review of Resident 79's physician's orders dated 2/17/19, indicated contact isolation (used for infections, diseases, or germs that are spread by touching the resident or items in the room, wear a gown and gloves while in the resident's room) for seven days to positive result of extended spectrum beta-lactamase (ESBL a type of enzyme or chemical produced by some bacteria, which cause some antibiotics not to work) in urine. During an observation, on 2/22/19, at 3:09 p.m., Resident 79 was on contact isolation and shared the room with other three non isolation residents, and shared the privacy curtain with one resident. During an interview, on 2/25/19, at 10:35 a.m., the Maintenance Supervisor (MS) stated, if a resident was on isolation, the curtain will be washed every day. The MS stated, the facility did not have written documentation that the isolation curtain was washed daily. A review of the facility log for cleaning of the privacy curtains for 2/2019 did not indicate Resident 79's privacy curtain was removed and washed every day or right after isolation status discontinued on 2/23/19. A review of the facility maintenance log did not indicate Resident 79's privacy curtain was removed and washed during the time period that the resident was on isolation. A review of the facility policy and procedure titled, Laundry, revised 1/10/19, indicated resident privacy curtains are laundered every six months or more frequently as necessary. A review of the facility policy and procedure titled, Isolation-Categories of Transmission-Based Precautions, revised 1/10/19, indicated: if the use of common items was unavoidable, then adequately clean and disinfect them before use for another resident. b. A review of Resident 55's Admission Record indicated the resident was admitted to the facility on [DATE] and was readmitted on [DATE], [DIAGNOSES REDACTED]. A review of Resident 55's Minimum Data Set (MDS-a standardized assessment and care planning tool) dated 2/14/19, indicated that Resident 55 was cognitively intact (the mental action or process of acquiring knowledge and understanding through thought, experience, and the senses) and required extensive staff assistance with one-person assist from staff for bed |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER / SUPPLIER / CLIA IDENNTIFICATION NUMBER<br>056489 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br>02/25/2019 |
|---|---|---|---|

| NAME OF PROVIDER OF SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP |
|---|---|
| HOLLYWOOD PREMIER HEALTHCARE CENTER | 5401 FOUNTAIN AVE.<br>LOS ANGELES, CA 90029 |

For information on the nursing home's plan to correct this deficiency, please contact the nursing home or the state survey agency.

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) |
|---|---|
| **F 0880**<br><br>Level of harm - Minimal harm or potential for actual harm<br><br>Residents Affected - Few | (continued... from page 4)<br>mobility, toilet use, personal hygiene and dressing.<br>A review of Resident 55's Care Plan, dated 10/12/18, indicated the resident had [MEDICAL CONDITION]. Proposed interventions included to administer oxygen via a nasal cannula (NC-tubing which delivers oxygen into the nostrils) at three liters per minute as needed for shortness of breath.<br>On 2/19/19, at 3:35 p.m., during an observation and concurrent interview, Resident 55 was in resting in bed. Resident 55 stated, she wanted to use her oxygen. Licensed Vocational Nurse 3 (LVN 3) assisted the resident. Resident 55's oxygen tubing was observed with no label indicated who the tubing belonged to or when it was applied. LVN 3 verified that the oxygen tubing/NC were not labeled with the resident's name or date. According to LVN 3, the N/C tubing should be labeled with the date it was first used to ensure infection prevention.<br>On 2/25/19, at 9:30 a.m., during an interview, the Director of Nursing (DON) stated, the oxygen administration tubing, mask or nasal cannula, and plastic bag was changed every week, every seven days on Sunday. When they get changed, the staff should labeled the oxygen tubing, NC, and the bag containing the tubing, with the resident's name, room number and date. |
| **F 0911**<br><br>Level of harm - Potential for minimal harm<br><br>Residents Affected - Some | Ensure resident rooms hold no more than 4 residents; for new construction after November 28, 2016, rooms hold no more than 2 residents.<br>**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**<br>Based on observation, interview, and facility record review, the facility failed to ensure that one of 35 resident rooms did not accommodate more than four residents.<br>Findings:<br>During a tour of the facility on 2/19/19, at 2:40 p.m., it was observed that room [ROOM NUMBER] had five residents bed.<br>A review of the facility client accommodation analysis form (a form that contains information about the residents' rooms in the facility) indicated that room [ROOM NUMBER] had five beds with one unoccupied bed, three beds occupied by three non-ambulatory residents, and one bed occupied by an ambulatory resident.<br>The form also indicated that room [ROOM NUMBER] measures 420 square feet (sq ft) equivalent to a space of 84 sq ft for each resident.<br>On 2/21/19, at 11:30 a.m., during an interview and concurrent record review, the Administrator stated, he was submitting a room waiver request for resident room [ROOM NUMBER], which had five resident beds. The room waiver request indicated that the residents needs are accommodated and that there was no adverse effect to the health and safety and welfare of the residents occupying these rooms.<br>During the course of the survey from 2/19/19 to 2/25/19, it was observed that the residents in the facility had no difficulty getting in and out of their rooms. The nursing staff had full access to provide treatment, administer medications, and assist residents to perform their individual routine activities of daily living.<br>The Department was recommend the granting of the room waiver. |

FORM CMS-2567(02-99)
Previous Versions Obsolete

Event ID: YL1O11

Facility ID: 056489

If continuation sheet
Page 5 of 5

# Exhibit 4

## LONG ISLAND / SUFFOLK
# Court: LI nursing home firm violated anti-human trafficking laws



Bent Philipson, a co-owner of SentosaCare, on March 23, 2007. Credit: Photo by Howard Schnapp

**By Yancey Roy**
yancey.roy@newsday.com 🐦 @yanceyroy
*Updated October 2, 2019 7:55 PM*

A federal judge has ruled that the owners of a Long Island-based nursing home company violated human trafficking laws by using financial threats to coerce more than 200 overworked and underpaid Filipino nurses to stay on the job.

The nurses said they all were recruited to the United States to take jobs with or through SentosaCare, a nursing home company based in Woodmere, but weren't paid what they were promised and were threatened with substantial financial penalties if they quit.

Such conditions amounted to a "threat of serious financial harm" designed to keep anyone from quitting and, therefore, violated anti-trafficking laws, Judge Nina Gershon of the federal Eastern District of New York ruled on Sept. 24. She determined the owners of Sentosa, Benjamin Landa and Bent Philipson, can be held personally liable for violations of anti-trafficking laws.

An attorney for the defendants said no nurses were threatened or compelled to work and said the ruling will be appealed.

For now, Gershon's decision sets the groundwork for the nurses to pursue a class-action lawsuit. It also marks the latest milestone in a story running more than a decade and including an attempt by then-Suffolk County District Attorney Thomas Spota to charge the nurses with endangering the welfare of children when they quit at two Smithtown facilities.

Eventually, a state court ruled the charges brought by Spota were unconstitutional because they violated the nurses' right to be free from slavery.

The case centers on SentosaCare as well as two other nursing and rehabilitation care companies, and two nurse-recruitment companies. The facilities and firms were involved in recruiting nurses from the Philippines to the United States.

The lawsuit at hand was filed in 2017 by nurse Rose Ann Paguirigan and on behalf of some 200 other nurses. But the tale of legal fights between the nurses and companies goes back even further, as Gershon noted.

**Get the Breaking News newsletter!**

Get the latest breaking news as it happens.

Email address              Sign up

By clicking Sign up, you agree to our privacy policy.

From 2006 to 2008, Sentosa and the other companies filed lawsuits against more than 30 Filipino nurses in attempt to force them to pay a $25,000 damages penalty inserted in their contracts for quitting, according to Gershon.

In the current legal action, it's the nurses who are suing. They alleged the companies didn't pay them the correct prevailing wage. They also asked the court to declare the damages penalty-unenforceable and, effectively, an illegal tool to keep the nurses bound to their jobs.

Besides SentosaCare, other defendants are Sentosa Nursing Recruitment Agency, Prompt Nursing Employment Agency, Golden Gate Rehabilitation and Health Center in Staten Island and Spring Creek Nursing and Rehabilitation Center in Brooklyn.

Paguirigan, according to court records, said in a deposition the penalty is the "reason we were not able to leave or were scared" while working in what she called unsafe and understaffed conditions.

Gershon agreed with the nurses.

"Having viewed the records and considered the parties' arguments, I find on the undisputed facts that defendant Prompt Nursing violated the TVPA," Gershon wrote, referring to the federal Trafficking Victims Protection Act.

"The nurses in this lawsuit were all recent arrivals from the Philippines," Gershon continued. "They were not paid the prevailing wage and a base salary, despite terms of their contracts ... Critically, if (Paguirigan) or any nurse wanted to stop working for the defendants during the first year of the contract, he or she would have to pay $25,000" as a penalty called "liquidated damages provision."

The judge concluded: "On these undisputed facts, it is apparent Prompt Nursing acted with knowledge and intent that the liquidated damages provision would effectively coerce nurses into continuing work."

Going further, Gershon ruled Landa and Philipson and others violated "conspiracy provisions" of the anti-trafficking act and, therefore, are personally liable.

The judges slated a Nov. 4 conference to address damages.

Elliot Hahn, one of the lawyers for the defendants, called the ruling disappointing. In an email, he said no nurses were threatened or "compelled to work." And he said Gershon looked past "well settled law" in determining the nurses' prevailing wage claims.

"The court's decision may have far reaching unintended consequences throughout the industry, and affecting contracts of all sorts, and would unduly burden both the employers and immigrant employees," Hahn wrote, in part. "Given this uncertainty, we anticipate that some employers may rescind the job offers and decline to execute contracts with the immigrant employees even if the United States government would otherwise grant a visa to the immigrant employees after they waited several years for the visa."

His clients will appeal, Hahn said.

An attorney for the nurses didn't immediately return messages to comment.

**By Yancey Roy**
yancey.roy@newsday.com 🐦 @yanceyroy



SPONSORED CONTENT
## COVID-19 and Healthcare Risks: Urgent Resources for Urgent Times
BY COVERYS
Get access to information and resources to help mitigate the risks in a COVID-19 environment.

## Didn't find what you were looking for?

Try our new Search

| search newsday.com | 🔍 |
| --- | --- |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

ROSE ANN PAGUIRIGAN, individually and
on behalf of all others similarly situated,                      :

                             Plaintiff,           :     **CLASS ACTION COMPLAINT**

                -vs-                                :     Plaintiff Demands A Jury Trial

PROMPT NURSING EMPLOYMENT AGENCY              :
LLC d/b/a SENTOSA SERVICES,
SENTOSACARE LLC, SENTOSA NURSING              :
RECRUITMENT AGENCY, BENJAMIN LANDA,
BENT PHILIPSON, BERISH RUBENSTEIN a/k/a       :
BARRY RUBENSTEIN, FRANCIS LUYUN,
GOLDEN GATE REHABILITATION & HEALTH           :
CARE CENTER LLC, and SPRING CREEK
REHABILITATION AND NURSING CENTER,            :

                       Defendants.          :

-----------------------------------------------------------------X

       Plaintiff ROSE ANN PAGUIRIGAN, by her undersigned attorneys, on behalf of

herself and all others similarly situated, as and for her complaint against the defendants,

alleges as follows:

       1.     This is an action for damages, injunctive relief, declaratory relief, and

other remedies for violations of the Trafficking Victims Protection Act (TVPA), 18

U.S.C. § 1589 *et seq.*, and for breach of contract under New York law.

       2.     Defendants are foreign labor recruiters and nursing home owners who

have recruited more than 350 nurses in the Philippines to work for the defendants in this

District under contracts of indentured servitude. Once the foreign nurses arrived in the

United States, the defendants refused to pay the wages required by their employment

contracts. To keep the foreign nurses from leaving, the defendants commenced and

threatened to commence baseless civil litigation, professional disciplinary proceedings,

⚠ Caution
As of: May 11, 2020 5:06 PM Z

## *Paguirigan v. Prompt Nursing Empl. Agency LLC*

United States District Court for the Eastern District of New York

September 23, 2019, Decided; September 24, 2019, Filed

17-cv-1302 (NG) (JO)

**Reporter**

2019 U.S. Dist. LEXIS 165587 *; 2019 WL 4647648

ROSE ANN PAGUIRIGAN, individually and on behalf of all others similarly situated, Plaintiff, -against- PROMPT NURSING EMPLOYMENT AGENCY LLC d/b/a/ SENTOSA SERVICES, SENTOSACARE LLC, SENTOSA NURSING RECRUITMENT AGENCY, BENJAMIN LANDA, BENT PHILIPSON, BERISH RUBENSTEIN a/k/a BARRY RUBENSTEIN, FRANCIS LUYUN, GOLDEN GATE REHABILITATION & HEALTH CARE CENTER LLC, and SPRING CREEK REHABILITATION AND NURSING CENTER, Defendants.

**Subsequent History:** Appeal filed, 10/23/2019

Reconsideration denied by *Paguirigan v. Prompt Nursing Empl. Agency LLC, 2020 U.S. Dist. LEXIS 4837 (E.D.N.Y., Jan. 9, 2020)*

Certificate of appealability denied *Paguirigan v. Prompt Nursing Empl. Agency LLC, 2020 U.S. Dist. LEXIS 4838 (E.D.N.Y., Jan. 9, 2020)*

**Prior History:** *Paguirigan v. Prompt Nursing Empl. Agency LLC, 286 F. Supp. 3d 430, 2017 U.S. Dist. LEXIS 218523 (E.D.N.Y., Dec. 20, 2017)*

## Case Summary

### Overview

HOLDINGS: [1]-Plaintiff nurse met the elements for her breach of contract claim because she proved that a contract existed between her and defendant nursing agency, that she performed under the contract, that the nursing agency breached the contract by failing to pay her the prevailing wage as of her Commencement Date and by failing to pay her a base salary, and that she was damaged; [2]-The liquidated damages provision in the contract was a penalty because it required plaintiff to submit a confession of judgment, for an amount of $25,000 if she quit in her first year, that would be held by defendants during her employment term, and could be filed in the event that the nurse terminated her contract early, thereby intending to operate as a means to compel performance, ensuring that the nurse and other nurses did not resign prior to the end of their contract terms.

### Outcome

Summary judgment granted in part. Plaintiffs' requested declaratory and injunctive relief granted.

**A** Neutral
As of: May 11, 2020 5:05 PM Z

# *Paguirigan v. Prompt Nursing Empl. Agency LLC*

United States District Court for the Eastern District of New York

January 9, 2020, Decided; January 9, 2020, Filed

17-cv-1302 (NG) (JO)

**Reporter**
2020 U.S. Dist. LEXIS 4837 *; 2020 WL 122704

ROSE ANN PAGUIRIGAN, individually and on behalf of all others similarly situated, Plaintiff, - against - PROMPT NURSING EMPLOYMENT AGENCY LLC d/b/a/ SENTOSA SERVICES, SENTOSACARE LLC, SENTOSA NURSING RECRUITMENT AGENCY, BENJAMIN LANDA, BENT PHILIPSON, BERISH RUBENSTEIN a/k/a BARRY RUBENSTEIN, FRANCIS LUYUN, GOLDEN GATE REHABILITATION & HEALTH CARE CENTER LLC, and SPRING CREEK REHABILITATION AND NURSING CENTER, Defendants.

**Prior History:** *Paguirigan v. Prompt Nursing Empl. Agency LLC, 2019 U.S. Dist. LEXIS 165587 (E.D.N.Y., Sept. 23, 2019)*

**Counsel:** [*1] For Rose Paguirigan, individually and on behalf of all others similarly situated, Plaintiff: Leandro Bolesa Lachica, Howley Law Firm, New York, NY; John J.P. Howley, Law Offices of John Howley, New York, NY.

For Prompt Nursing Employment Agency LLC, doing business as, Sentosa Services, Sentosacare, LLC, Sentosa Nursing Recruitment Agency, Mr. Benjamin Landa, Bent Philipson, Berish Rubenstein, also known as, Barry Rubenstein,

Francis Luyun, Golden Gate Rehabilitation and Health Care Center, LLC, Spring Creek Rehabilitation and Nursing Center, Defendants: Elliot Hahn, LEAD ATTORNEY, Hahn Eisenberger PLLC, Brooklyn, NY; Sheldon Eisenberger, LEAD ATTORNEY, Alan M. Pollack, Robinson Brog Leinwand Greene Genovese & Gluck PC, New York, NY; Seth Eisenberger, Law Office of Seth Eisenberger, Brooklyn, NY.

For Mr. Benjamin Landa, Golden Gate Rehabilitation and Health Care Center, LLC, Bent Philipson, Spring Creek Rehabilitation and Nursing Center, Prompt Nursing Employment Agency LLC, Berish Rubenstein, Sentosacare, LLC, Francis Luyun, Sentosa Nursing Recruitment Agency, Counter Claimants: Elliot Hahn, LEAD ATTORNEY, Hahn Eisenberger PLLC, Brooklyn, NY; Sheldon Eisenberger, LEAD ATTORNEY, Alan M. [*2] Pollack, Robinson Brog Leinwand Greene Genovese & Gluck PC, New York, NY; Seth Eisenberger, Law Office of Seth Eisenberger, Brooklyn, NY.

For Rose Paguirigan, individually and on behalf of all others similarly situated, Counter Defendant: Leandro Bolesa Lachica, Howley Law Firm, New York, NY; John J.P. Howley, Law Offices of John Howley, New York, NY.

# Exhibit 5

1  ANNE MARIE MURPHY (SBN 202540)
2  amurphy@cpmlegal.com
   ANDREW F. KIRTLEY (SBN 328023)
3  akirtley@cpmlegal.com
4  **COTCHETT, PITRE & McCARTHY, LLP**
   840 Malcolm Road
5  Burlingame, California 94010
6  Telephone: (650) 697-6000

7  GARY ALLAN PRAGLIN (SBN 101256)
8  gpraglin@cpmlegal.com
   LESLIE A. HAKALA (SBN 199414)
9  lhakala@cpmlegal.com
10 **COTCHETT, PITRE & McCARTHY, LLP**
   2716 Ocean Park Blvd Suite 3088
11 Santa Monica, CA 90405
12 Telephone: (310) 392-2008

13 *Attorneys for Plaintiffs*

14
       **UNITED STATES DISTRICT COURT**
15     **CENTRAL DISTRICT OF CALIFORNIA**

16 **EMMA MARTIN,**                    Case No. 2:20-cv-05937-DSF-SK
17 **ELIZABETH GAGLIANO** and
   **KATHRYN SESSINGHAUS,**            [Removal from Superior Court
18 individually and as heirs of **VINCENT**  California, County of Los Angeles,
   **PAUL MARTIN,** deceased,          Case No. 20STCV19545]
19

20           Plaintiffs,              **DECLARATION OF PLAINTIFF**
21        v.                          **EMMA MARTIN AS SUCCESSOR-**
                                      **ININTEREST PURSUANT TO**
   Serrano Post Acute LLC d/b/a       **CALIFORNIA CODE OF CIVIL**
22 **HOLLYWOOD PREMIER**              **PROCEDURE § 377.32**
23 **HEALTHCARE CENTER,**
   a/k/a Serrano Healthcare,
24 a/k/a Serrano North Convalescent
25 Hospital; **BENJAMIN LANDA,** an
   individual; **MARCEL ADRIAN**
26 **SOLERO FILART,** an individual;
27 and, **DOES 1-50,**

28           Defendants.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

   **DECLARATION OF PLAINTIFF EMMA MARTIN AS SUCCESSOR-IN-INTEREST**

1       I, EMMA MARTIN, hereby declare as follows:

2       1.    I am over 18 years of age.  I make this declaration based on facts

3  within my own personal knowledge and if called as a witness, I could and would

4  competently testify thereto.

5       2.   .  I am the widow of Vincent Martin, who died on April 4, 2020, at Los

6  Angeles, California.  A Certified copy of Vincent Martin's death certificate is

7  attached hereto as Exhibit A.

8       3.    This declaration is made pursuant to California Code of Civil

9  Procedure § 377.32.

10      4.    I, as a successor-in-interest to Vincent Martin, deceased, bring this

11  survivorship action pursuant to § 377.30 *et seq*. of the California Code of Civil

12  Procedure on behalf of the Estate of Vincent Martin (**"Decedent"**).

13      5.    No proceeding is now pending in the State of California for

14  administration of the Estate of Vincent Martin.

15      6.    I am one of the successors-in-interest to Vincent Martin as defined in

16  Section 377.11 of the California Code of Civil Procedure and succeed to his

17  interest in the above-entitled proceeding.

18      7.    I am authorized by Vincent Martin's other successors-in-interest,

19  Elizabeth Gagliano and Kathryn Sessinghaus, to act jointly with them and on

20  their behalves, in the above-entitled proceeding.

21      8.    No other person has a superior right to commence the action or

22  proceeding or to be substituted for Vincent Martin in the pending action or

23  proceeding.

24      I declare under penalty of perjury under the laws of the State of California

25  that the foregoing is true and correct.

26      Executed this 24th day of August, 2020 at *No. Hollywood* California

27

28           *Emma Martin*  Emma Martin

**DECLARATION OF PLAINTIFF EMMA MARTIN AS SUCCESSOR-IN-INTEREST**

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF LOS ANGELES
## DEPARTMENT OF PUBLIC HEALTH

| 3052020075725 | CERTIFICATE OF DEATH | 3202019017225 |
|---|---|---|
| STATE FILE NUMBER | | LOCAL REGISTRATION NUMBER |

**DECEDENT PERSONAL DATA**

- 1. NAME OF DECEDENT—FIRST (Given): **VINCENT**
- 2. MIDDLE: **PAUL**
- 3. LAST (Family): **MARTIN**
- AKA, ALSO KNOWN AS: —
- 4. DATE OF BIRTH: **08/31/1935**
- 5. AGE Yrs.: **84**
- 6. SEX: **M**
- 8. BIRTH STATE/FOREIGN COUNTRY: **NY**
- 10. SOCIAL SECURITY NUMBER: —
- 11. EVER IN U.S. ARMED FORCES?: **YES** [X]   NO
- 12. MARITAL STATUS: **MARRIED**
- 7. DATE OF DEATH: **04/04/2020**
- 9. HOUR: **0151**
- 13. EDUCATION: **ASSOCIATE**
- 14/15. WAS DECEDENT HISPANIC/LATINO?: NO [X]
- 16. DECEDENT'S RACE: **CAUCASIAN**
- 17. USUAL OCCUPATION: **GRAPHIC ARTIST**
- 18. KIND OF BUSINESS OR INDUSTRY: **ART**
- 19. YEARS IN OCCUPATION: **31**

**USUAL RESIDENCE**

- 21. CITY: **NORTH HOLLYWOOD**
- 22. COUNTY/PROVINCE: **LOS ANGELES**
- 23. ZIP CODE: **91601**
- 24. YEARS IN COUNTY: **59**
- 25. STATE/FOREIGN COUNTRY: **CA**

**INFORMANT**

- 28. INFORMANT'S NAME, RELATIONSHIP: **KATHRYN SESSINGHAUS, DAUGHTER**

**SPOUSE AND PARENT INFORMATION**

- 24. NAME OF SURVIVING SPOUSE—FIRST: **EMMA**
- 25. MIDDLE:
- 26. LAST (BIRTH NAME):
- 32. NAME OF FATHER/PARENT—FIRST: **JOHN**
- 33. MIDDLE:
- 23. LAST:
- 34. BIRTH STATE: **NJ**
- 36. NAME OF MOTHER/PARENT—FIRST: **ANNA**
- 34. MIDDLE: **E.**
- 27. LAST (BIRTH NAME):
- 38. BIRTH STATE: **NY**

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

- 38. DISPOSITION DATE: **04/16/2020**
- 40. PLACE OF FINAL DISPOSITION: **SCATTER AT SEA OFF THE COAST OF VENTURA COUNTY**
- 41. TYPE OF DISPOSITION(S): **CR/SEA**
- 42. SIGNATURE OF EMBALMER: ▶ **NOT EMBALMED**
- 44. NAME OF FUNERAL ESTABLISHMENT: **VALLEY FUNERAL HOME**
- 45. LICENSE NUMBER: **FD976**
- 46. SIGNATURE OF LOCAL REGISTRAR: ▶ **MUNTU DAVIS, M.D.**
- 47. DATE: **04/10/2020**

**PLACE OF DEATH**

- 101. PLACE OF DEATH: **SERRANO N. CONVALESCENT HOSPITAL**
- 102. IF HOSPITAL, SPECIFY ONE: [X] Nursing Home/LTC
- 103. IF OTHER THAN HOSPITAL, SPECIFY ONE:
- 103. FACILITY ADDRESS OR LOCATION WHERE FOUND: **5401 FOUNTAIN AVENUE**
- 104. COUNTY: **LOS ANGELES**
- 105. CITY: **LOS ANGELES**

**CAUSE OF DEATH**

- 127. CAUSE OF DEATH
  - IMMEDIATE CAUSE (A): **CARDIORESPIRATORY ARREST**   Time Interval: MINS
  - Sequentially (B): **ESSENTIAL HYPERTENSION**   YRS
  - (C): **CORONARY ARTERY DISEASE**   YRS
  - (D):
- 108. DEATH REPORTED TO CORONER?: YES / [X] NO
- 109. BIOPSY PERFORMED?: YES / [X] NO
- 110. AUTOPSY PERFORMED?: YES / [X] NO
- 111. USED IN DETERMINING CAUSE?: YES / NO
- 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107: **NONE**
- 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112?: **NO**

**PHYSICIAN'S CERTIFICATION**

- 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED.
- 115. SIGNATURE AND TITLE OF CERTIFIER: ▶ **MARCEL FILART M.D.**
- 116. LICENSE NUMBER: **A76022**
- 117. DATE: **04/09/2020**
- Decedent Attended Since: **11/21/2018**   Decedent Last Seen Alive: **04/01/2020**
- 116. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE: **MARCEL FILART M.D., 1711 W TEMPLE ST SUITE 1070, LOS ANGELES, CA 90026**

**CORONER'S USE ONLY**

- 118. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED.
- MANNER OF DEATH: Natural / Accident / Homicide / Suicide / Pending Investigation / Could not be determined
- 120. INJURED AT WORK?: YES / NO / UNK
- 121. INJURY DATE:
- 122. HOUR:
- 123. PLACE OF INJURY:
- 124. DESCRIBE HOW INJURY OCCURRED:
- 125. LOCATION OF INJURY:
- 126. SIGNATURE OF CORONER / DEPUTY CORONER: ▶
- 127. DATE:
- 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER:

**STATE REGISTRAR**

| A | B | C | D | E | *010001004500339* | FAX AUTH# | CENSUS TRACT |
|---|---|---|---|---|---|---|---|

CALOSANGO1

---

## CERTIFIED COPY OF VITAL RECORD
### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

This is a true certified copy of the record filed in the County of Los Angeles Department of Public Health if it bears the Registrar's signature in purple ink.

Health Officer and Registrar   DO 11   DATE ISSUED   **APR 14 2020**

002399459

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the Registrar.

**ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE**



# Exhibit 6

ANNE MARIE MURPHY (SBN 202540)
amurphy@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California 94010
Telephone: (650) 697-6000

GARY ALLAN PRAGLIN (SBN 101256)
gpraglin@cpmlegal.com
LESLIE A. HAKALA (SBN 199414)
lhakala@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Blvd Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EMMA MARTIN, ELIZABETH GAGLIANO** and **KATHRYN SESSINGHAUS,** individually and as heirs of **VINCENT PAUL MARTIN**, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>Serrano Post Acute LLC d/b/a **HOLLYWOOD PREMIER HEALTHCARE CENTER,** a/k/a Serrano Healthcare, a/k/a Serrano North Convalescent Hospital; **BENJAMIN LANDA**, an individual; **MARCEL ADRIAN SOLERO FILART**, an individual; and, **DOES 1-50,**<br><br>Defendants. | Case No. 2:20-cv-05937-DSF-SK<br><br>[Removal from Superior Court California, County of Los Angeles, Case No. 20STCV19545]<br><br>**DECLARATION OF PLAINTIFF ELIZABETH GAGLIANO AS SUCCESSOR-IN-INTEREST PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 377.32** |

I, Elizabeth Gagliano, hereby declare as follows:

1.    I am over 18 years of age. I make this declaration based on facts within my own personal knowledge and if called as a witness, I could and would competently testify thereto.

2.    I am the daughter of Vincent Martin, who died on April 4, 2020, at Los Angeles, California. A Certified copy of Vincent Martin's death certificate is attached hereto as Exhibit A.

3.    This declaration is made pursuant to California Code of Civil Procedure § 377.32.

4.    I, as a successor-in-interest to Vincent Martin, deceased, bring this survivorship action pursuant to § 377.30 *et seq.* of the California Code of Civil Procedure on behalf of the Estate of Vincent Martin ("**Decedent**").

5.    No proceeding is now pending in the State of California for administration of the Estate of Vincent Martin.

6.    I am one of the successors-in-interest to Vincent Martin as defined in Section 377.11 of the California Code of Civil Procedure and succeed to his interest in the above-entitled proceeding.

7.    I am authorized by Vincent Martin's other successors-in-interest, Kathryn Sessinghaus and Emma Martin, to act jointly with them and on their behalves, in the above-entitled proceeding.

8.    No other person has a superior right to commence the action or proceeding or to be substituted for Vincent Martin in the pending action or proceeding.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 24th day of August, 2020 at *Scottsdale*, Arizona.

*Elizabeth Gagliano*           Elizabeth Gagliano

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF LOS ANGELES
## DEPARTMENT OF PUBLIC HEALTH

| 3052020075725 | CERTIFICATE OF DEATH | 3202019017225 |
|---|---|---|
| STATE FILE NUMBER | | LOCAL REGISTRATION NUMBER |

**DECEDENT PERSONAL DATA**

| 1. NAME OF DECEDENT—FIRST (Given) VINCENT | 2. MIDDLE PAUL | 3. LAST (Family) MARTIN |
|---|---|---|

| AKA, ALSO KNOWN AS – Include full AKA (FIRST, MIDDLE, LAST) | 4. DATE OF BIRTH mm/dd/ccyy 08/31/1935 | 5. AGE Yrs. 84 | IF UNDER 1 YEAR Months Days | IF UNDER 24 HOURS Hours Minutes | 6. SEX M |

| 8. BIRTH STATE/FOREIGN COUNTRY NY | 10. SOCIAL SECURITY NUMBER | 11. EVER IN U.S. ARMED FORCES? [X] YES [ ] NO | 12. MARITAL STATUS/SNGP (at Time of Death) MARRIED | 7. DATE OF DEATH mm/dd/ccyy 04/04/2020 | 9. HOUR (24 Hours) 0151 |

| 13. EDUCATION – Highest Level/Degree ASSOCIATE | 14/15. WAS DECEDENT HISPANIC/LATINO/A/SPANISH? If yes, see worksheet on back [ ] YES [X] NO | 16. DECEDENT'S RACE – Up to 3 races may be listed (see worksheet on back) CAUCASIAN |

| 17. USUAL OCCUPATION – Type of work for most of life, DO NOT USE RETIRED GRAPHIC ARTIST | 18. KIND OF BUSINESS OR INDUSTRY (e.g., grocery store, road construction, employment agency, etc.) ART | 19. YEARS IN OCCUPATION 31 |

**USUAL RESIDENCE**

| 21. CITY NORTH HOLLYWOOD | 22. COUNTY/PROVINCE LOS ANGELES | 23. ZIP CODE 91601 | 24. YEARS IN COUNTY 59 | 25. STATE/FOREIGN COUNTRY CA |

**INFORMANT**

| 26. INFORMANT'S NAME, RELATIONSHIP KATHRYN SESSINGHAUS, DAUGHTER | |

**SPOUSE/PARENT INFORMATION**

| 34. NAME OF SURVIVING SPOUSE/SRDP—FIRST EMMA | 29. MIDDLE | 30. LAST (BIRTH NAME) |
|---|---|---|
| 31. NAME OF FATHER/PARENT—FIRST JOHN | 32. MIDDLE – | 33. LAST | 34. BIRTH STATE NJ |
| 35. NAME OF MOTHER/PARENT—FIRST ANNA | 36. MIDDLE E. | 37. LAST (BIRTH NAME) | 38. BIRTH STATE NY |

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

| 39. DISPOSITION DATE mm/dd/ccyy 04/16/2020 | 40. PLACE OF FINAL DISPOSITION SCATTER AT SEA OFF THE COAST OF VENTURA COUNTY | | |
| 41. TYPE OF DISPOSITION(S) CR/SEA | 42. SIGNATURE OF EMBALMER ▶ NOT EMBALMED | | 43. LICENSE NUMBER |
| 44. NAME OF FUNERAL ESTABLISHMENT VALLEY FUNERAL HOME | 45. LICENSE NUMBER FD976 | 46. SIGNATURE OF LOCAL REGISTRAR ▶ MUNTU DAVIS, M.D. | 47. DATE mm/dd/ccyy 04/10/2020 |

**PLACE OF DEATH**

| 101. PLACE OF DEATH SERRANO N. CONVALESCENT HOSPITAL | 102. IF HOSPITAL, SPECIFY ONE [ ] IP [ ] EROP [ ] COA | 103. IF OTHER THAN HOSPITAL, SPECIFY ONE [X] Nursing Home/LTC [ ] Decedent's Home [ ] Other |
| 104. COUNTY LOS ANGELES | 105. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number, or location) 5401 FOUNTAIN AVENUE | 106. CITY LOS ANGELES |

**CAUSE OF DEATH**

| 107. CAUSE OF DEATH | | Time Interval Between Onset and Death | 108. DEATH REPORTED TO CORONER? [ ] YES [X] NO |
|---|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | A) CARDIORESPIRATORY ARREST | MINS | 109. BIOPSY PERFORMED? [ ] YES [X] NO |
| Sequentially, list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST | B) ESSENTIAL HYPERTENSION | YRS | 110. AUTOPSY PERFORMED? [ ] YES [X] NO |
| | C) CORONARY ARTERY DISEASE | YRS | 111. USED IN DETERMINING CAUSE? [ ] YES [ ] NO |
| | D) | | |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 NONE | |
| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? If yes, list type of operation and date) NO | 113A. IF FEMALE, PREGNANT IN LAST YEAR? [ ] YES [ ] NO [ ] UNK |

**PHYSICIAN'S CERTIFICATION**

| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. Decedent Attended Since 11/21/2018   mm/dd/ccyy    Decedent Last Seen Alive 04/01/2020   mm/dd/ccyy | 115. SIGNATURE AND TITLE OF CERTIFIER ▶ MARCEL FILART M.D. | 116. LICENSE NUMBER A76022 | 117. DATE mm/dd/ccyy 04/09/2020 |
|---|---|---|---|
| | 116. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE MARCEL FILART M.D. 1711 W TEMPLE ST SUITE 1070, LOS ANGELES, CA 90026 | | |

**CORONER'S USE ONLY**

| 118. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. MANNER OF DEATH [ ] Natural [ ] Accident [ ] Homicide [ ] Suicide [ ] Pending Investigation [ ] Could not be determined | 120. INJURED AT WORK? [ ] YES [ ] NO [ ] UNK | 121. INJURY DATE mm/dd/ccyy | 122. HOUR 24 Hours |
| 123. PLACE OF INJURY (e.g., home, construction site, wooded area, etc.) | | | |
| 124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) | | | |
| 125. LOCATION OF INJURY (Street and number, or location, and city, and zip) | | | |
| 126. SIGNATURE OF CORONER / DEPUTY CORONER ▶ | 127. DATE mm/dd/ccyy | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER |

**STATE REGISTRAR**

| A | B | C | D | E | *010001004500339* | FAX AUTH# | CENSUS TRACT |

CALOSANGO1

---

## CERTIFIED COPY OF VITAL RECORD
### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

This is a true certified copy of the record filed in the County of Los Angeles Department of Public Health if it bears the Registrar's signature in purple ink.

 MD DATE ISSUED  APR 14 2020

Health Officer and Registrar DO 11

002399459

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the Registrar.



**ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE**

# Exhibit 7

ANNE MARIE MURPHY (SBN 202540)
amurphy@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California 94010
Telephone: (650) 697-6000

GARY ALLAN PRAGLIN (SBN 101256)
gpraglin@cpmlegal.com
LESLIE A. HAKALA (SBN 199414)
lhakala@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Blvd Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EMMA MARTIN, ELIZABETH GAGLIANO** and **KATHRYN SESSINGHAUS,** individually and as heirs of **VINCENT PAUL MARTIN,** deceased,<br><br>Plaintiffs,<br>v.<br>Serrano Post Acute LLC d/b/a **HOLLYWOOD PREMIER HEALTHCARE CENTER,** a/k/a Serrano Healthcare, a/k/a Serrano North Convalescent Hospital; **BENJAMIN LANDA,** an individual; **MARCEL ADRIAN SOLERO FILART,** an individual; and, **DOES 1-50,**<br><br>Defendants. | Case No. 2:20-cv-05937-DSF-SK<br><br>[Removal from Superior Court California, County of Los Angeles, Case No. 20STCV19545]<br><br>**DECLARATION OF PLAINTIFF KATHRYN SESSINGHAUS AS SUCCESSOR-ININTEREST PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 377.32** |

1    I, Kathryn Sessinghaus, hereby declare as follows:

2    1.    I am over 18 years of age.  I make this declaration based on facts

3    within my own personal knowledge and if called as a witness, I could and would

4    competently testify thereto.

5    2.    I am the daughter of Vincent Martin, who died on April 4, 2020, at

6    Los Angeles, California.  A Certified copy of Vincent Martin's death certificate is

7    attached hereto as Exhibit A.

8    3.    This declaration is made pursuant to California Code of Civil

9    Procedure § 377.32.

10    4.    I, as a successor-in-interest to Vincent Martin, deceased, bring this

11    survivorship action pursuant to § 377.30 *et seq.* of the California Code of Civil

12    Procedure on behalf of the Estate of Vincent Martin ("**Decedent**").

13    5.    No proceeding is now pending in the State of California for

14    administration of the Estate of Vincent Martin.

15    6.    I am one of the successors-in-interest to Vincent Martin as defined in

16    Section 377.11 of the California Code of Civil Procedure and succeed to his

17    interest in the above-entitled proceeding.

18    7.    I am authorized by Vincent Martin's other successors-in-interest,

19    Elizabeth Gagliano and Emma Martin, to act jointly with them and on their

20    behalves, in the above-entitled proceeding.

21    8.    No other person has a superior right to commence the action or

22    proceeding or to be substituted for Vincent Martin in the pending action or

23    proceeding.

24    I declare under penalty of perjury under the laws of the State of California

25    that the foregoing is true and correct.

26    Executed this 24th day of August, 2020 at _Burbank_ , California

27

28    _[signature]_     Kathryn Sessinghaus

**DECL. OF PLAINTIFF KATHRYN SESSINGHAUS AS SUCCESSOR-IN-INTEREST**

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF LOS ANGELES
## DEPARTMENT OF PUBLIC HEALTH

**STATE FILE NUMBER** 3052020075725    **CERTIFICATE OF DEATH**    **LOCAL REGISTRATION NUMBER** 3202019017225

| Field | Value |
|---|---|
| 1. NAME OF DECEDENT—FIRST (Given) | VINCENT |
| 2. MIDDLE | PAUL |
| 3. LAST (Family) | MARTIN |
| 4. DATE OF BIRTH | 08/31/1935 |
| 5. AGE Yrs. | 84 |
| 6. SEX | M |
| 8. BIRTH STATE/FOREIGN COUNTRY | NY |
| 11. EVER IN U.S. ARMED FORCES? | YES |
| 12. MARITAL STATUS | MARRIED |
| 7. DATE OF DEATH | 04/04/2020 |
| 9. HOUR | 0151 |
| 13. EDUCATION | ASSOCIATE |
| 16. DECEDENT'S RACE | CAUCASIAN |
| 17. USUAL OCCUPATION | GRAPHIC ARTIST |
| 18. KIND OF BUSINESS OR INDUSTRY | ART |
| 19. YEARS IN OCCUPATION | 31 |
| 21. CITY | NORTH HOLLYWOOD |
| 22. COUNTY/PROVINCE | LOS ANGELES |
| 23. ZIP CODE | 91601 |
| 24. YEARS IN COUNTY | 59 |
| 25. STATE/FOREIGN COUNTRY | CA |
| 29. INFORMANT'S NAME, RELATIONSHIP | KATHRYN SESSINGHAUS, DAUGHTER |
| 34. NAME OF SURVIVING SPOUSE/SRDP—FIRST | EMMA |
| 32. MIDDLE | — |
| 33. LAST | — |
| 34. BIRTH STATE | NJ |
| 34. NAME OF FATHER/PARENT—FIRST | JOHN |
| 35. NAME OF MOTHER/PARENT—FIRST | ANNA |
| 36. MIDDLE | E. |
| 38. BIRTH STATE | NY |
| 38. DISPOSITION DATE | 04/16/2020 |
| 40. PLACE OF FINAL DISPOSITION | SCATTER AT SEA OFF THE COAST OF VENTURA COUNTY |
| 41. TYPE OF DISPOSITION | CR/SEA |
| 42. SIGNATURE OF EMBALMER | ▶ NOT EMBALMED |
| 44. NAME OF FUNERAL ESTABLISHMENT | VALLEY FUNERAL HOME |
| 45. LICENSE NUMBER | FD976 |
| 46. SIGNATURE OF LOCAL REGISTRAR | ▶ MUNTU DAVIS, M.D. |
| 47. DATE | 04/10/2020 |
| 101. PLACE OF DEATH | SERRANO N. CONVALESCENT HOSPITAL |
| 102. IF HOSPITAL, SPECIFY ONE | |
| 103. IF OTHER THAN HOSPITAL, SPECIFY ONE | |
| 104. COUNTY | LOS ANGELES |
| 105. FACILITY ADDRESS OR LOCATION WHERE FOUND | 5401 FOUNTAIN AVENUE |
| 106. CITY | LOS ANGELES |

**127. CAUSE OF DEATH**

| | |
|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | a. CARDIORESPIRATORY ARREST — MINS |
| Sequentially, list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST | b. ESSENTIAL HYPERTENSION — YRS |
| | c. CORONARY ARTERY DISEASE — YRS |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 | NONE |
|---|---|
| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? | NO |

| Field | Value |
|---|---|
| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED... | ▶ MARCEL FILART M.D. |
| 115. SIGNATURE AND TITLE OF CERTIFIER | |
| 116. LICENSE NUMBER | A76022 |
| 117. DATE | 04/09/2020 |
| 116. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | MARCEL FILART M.D.  1711 W TEMPLE ST SUITE 1070, LOS ANGELES, CA 90026 |
| 118. | 11/21/2018 : 04/01/2020 |



## CERTIFIED COPY OF VITAL RECORD
### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

This is a true certified copy of the record filed in the County of Los Angeles Department of Public Health if it bears the Registrar's signature in purple ink.

002399459

Health Officer and Registrar    DO 11    DATE ISSUED    APR 14 2020

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the Registrar.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



CALOSANGO1

# Exhibit 8

Case 2:20-cv-09597-DSF-SK Document 18 Filed 05/24/20 Page 2 of 12 Page ID #:833

United States Department of Justice

## THE UNITED STATES ATTORNEY'S OFFICE
## CENTRAL DISTRICT *of* CALIFORNIA

U.S. Attorneys » Central District of California » News

**Department of Justice**

U.S. Attorney's Office

Central District of California

FOR IMMEDIATE RELEASE                    Wednesday, June 28, 2017

# Los Angeles Hospital Agrees To Pay $42 Million to Settle Allegations Arising From Improper Financial Arrangements with Physicians

*LOS ANGELES* – The owners of Pacific Alliance Medical Center, an acute care hospital located in the Chinatown District of Los Angeles, have agreed to pay $42 million to settle allegations that they were involved in improper financial relationships with referring physicians, the Justice Department announced today.

PAMC, Ltd. and Pacific Alliance Medical Center Inc., the owners of the hospital, agreed to pay the settlement to resolve a lawsuit that alleged they had violated the False Claims Act by submitting false claims to the Medicare and MediCal programs.

The settlement, which was finalized this week, calls for PAMC Ltd. and Pacific Alliance Medical Center Inc. to pay $31.9 million to the United States and $10 million to the State of California.

The settlement resolves allegations brought in a "whistleblower" lawsuit that the defendants submitted or caused to be submitted false claims to Medicare and MediCal for services rendered to patients who had been referred by physicians with whom the defendants had improper financial relationships.

These improper relationships took the form of (1) arrangements under which the defendants allegedly paid above-market rates to rent office space in physicians' offices, and (2) marketing arrangements that allegedly provided undue benefit to physicians' practices.

The lawsuit alleged that these relationships violated the Anti-Kickback Statute and the Stark Law, both of which restrict the financial relationships that hospitals may have with doctors who refer patients to them.

"Federal law prohibits improper financial relationships between hospitals that receive federal health care funds and medical professionals – this is to protect the doctor-patient relationship and to ensure the quality of care provided," said Acting United States Attorney Sandra R. Brown. "Patients deserve to know their doctors are making health care decisions based solely on medical need and not for any potential financial benefit."

The whistleblower lawsuit was filed by Paul Chan, who was employed as a manager by one of the defendants, under the *qui tam* provisions of the False Claims Act. Under the False Claims Act, private citizens can bring suit on behalf of the United States and share in any recovery. The United States may intervene in the lawsuit, or, as in this case, the whistleblower may pursue the action. Mr. Chan will receive over $9.2 million as his share of the federal recovery.

"This is another example of how the False Claims Act whistleblower provisions can help protect the public fisc," said Acting Assistant Attorney General Chad A. Readler of the Justice Department's Civil Division. "This recovery should help to deter other health care providers from entering into improper financial relationships with physicians that can taint the physicians' medical judgment, to the detriment of patients and taxpayers."

"This settlement is a warning to health care companies that think they can boost their profits by entering into improper financial arrangements with referring physicians," said Special Agent in Charge Christian J. Schrank of the Department of Health and Human Services, Office of Inspector General (HHS-OIG). "Working with our law enforcement partners, we will continue to crack down on such deals, which work to undermine impartial medical judgement, drive up health care costs, and corrode the public's trust in the health care system."

The case, *United States ex rel. Chan v. PAMC, Ltd., et al.*, CV13-4273 (C.D. Cal.), was monitored by the United States Attorney's Office, the Civil Division's Commercial Litigation Branch, and HHS-OIG.

The defendants have until July 7 to make the settlement payments.

The claims settled by this agreement are allegations only, and the defendants did not admit liability in settling the action.

---

**Component(s):**
USAO - California, Central

**Contact:**
Thom Mrozek
Spokesperson/Public Affairs Officer
United States Attorney's Office
Central District of California (Los Angeles)
213-894-6947

**Press Release Number:**
17-130

1  Donald R. Warren (CA 138933)
   Phillip E. Benson (CA 97420)
2  Warren - Benson Law Group
   7825 Fay Ave., Ste. 200
3  La Jolla, CA 92037
   Tel: 858-454-2877
4  Fax: 858-454-5878
   donwarren@warrenbensonlaw.com
5  philbenson@warrenbensonlaw.com

6  Attorneys for *Qui Tam* Plaintiff

7
                    UNITED STATES DISTRICT COURT
8                 CENTRAL DISTRICT OF CALIFORNIA
                       WESTERN DIVISION
9

10  UNITED STATES OF AMERICA          CASE NO.  13 cv 04273 - RGK (MRWx)
    AND STATE OF CALIFORNIA,
11  ex rel Paul Chan,

12          Plaintiffs,               QUI TAM PLAINTIFF'S
                                      CORRECTED THIRD AMENDED
13  v.                                COMPLAINT

14
    PAMC, LTD.; and PACIFIC
15  ALLIANCE MEDICAL CENTER,
    INC.,
16
            Defendants
17

18

19

20

21

22

23

24

25

26

27

28

*Qui Tam* Plaintiff Paul Chan suing for himself and for the United States and the State of California, alleges as follows[1]:

## I. INTRODUCTION

1.      For years, Defendant PAMC, Ltd. has brazenly violated the Stark Statute and the Anti-Kickback Statute by paying doctors as an inducement to refer patients to PAMC hospital.  One referring doctor, who initially balked at a kickback offer which required that he admit 15 - 20 patients per month, stated: "There are Stark laws."  Shortly after the doctor also asked the PAMC's Interim Vice President of Business Development if she would put the offer in writing, the Interim V.P. of Business Development retorted, "*Fuck that.  I'm not putting that in writing.*"

2.      PAMC, Ltd. is a fully integrated healthcare company with different lines of business including not only 1) PAMC hospital, but also 2) a managed care organization, 3) two Independent Practice Associations which contract with independent physicians to provide services to managed care, and 4) a 50% ownership in a health plan specifically for Medi-Cal (California's Medicaid) patients.  In the operation of its PAMC hospital business segment, PAMC, Ltd. has knowingly engaged in a pervasive scheme to pay illegal compensation/remuneration to referring physicians in violation of the Stark Statute and the Anti-Kickback Statute, resulting in PAMC's submission of false claims to Medicare and Medi-Cal totaling more than $15 million per year for at least the past nine years, all of which is within the applicable statute of

---

[1]Pursuant to the decision of the Ninth Circuit Court of Appeals in *Lacey v. Maricopa County*, 693 F.3d 896, 925-928 (2012), claims alleged in the First Amended Complaint that have been dismissed with prejudice and that are not realleged herein are not waived and are preserved for appeal.  Those claims involve allegations as to the liability of Dr. Shin-Yin Wong; Dr. George Ma; Dr. Tit Li; Dr. Carl Moy; Dr. Thick Gong Chow and Dr. Stephen Kwan.

**is determined in a manner that takes into account the volume or value of referrals** from the referring physician/clinic each month (violating the Stark Statute), and is made with a purpose of inducing referrals (violating the Anti-Kickback Statute).

112.    One example of a Vendor Marketing Agreement involved a PAMC payment of $5,000 per month for one of its top referring Medicare doctors: Dr. Marcel Filart.  In return, Dr. Filart was supposed to admit 17 patients per month to PAMC.  In Dr. Filart's situation, PAMC paid the monthly $5,000 to a person named Samvel Kostandyna who, on information and belief, is Dr. Filart's father in law.  From Relator Paul Chan's discussions with Mr. Kostandyna and his daughter, in which they explained to Mr. Chan that they did not know how to prepare an invoice, it its believed that Mr. Kostandyna does not have any sort of marketing business and has never done any marketing for Dr. Filart.  On information and belief, the supposed Vendor Marketing Agreement for Dr. Filart is a complete sham and simply a way to funnel money to Dr. Filart in exchange for his admissions to PAMC.

113.    PAMC received many Medi-Cal and Medicare patient referrals/admissions from physicians with prohibited compensation arrangements via the above described Vendor Marketing Agreement programs.  PAMC wrongfully billed government healthcare programs for its hospital services for these referred patients and received reimbursements.  Qui Tam Relator Paul Chan does not have access to these billings, but he knows that PAMC diligently tracks these referrals/admissions, the related billings, and the resulting reimbursements.

114.    **5.)  <u>"Medical Directorships" to Induce the Recommendation and Referral of Medi-Cal and Medicare Patients.</u>**   A fifth way in which PAMC compensates physicians based upon referrals to the hospital is by awarding medical directorships to its top referring physicians, based on a target number of

referrals/admissions to be made by the physicians.  Two examples of this situation involve top referring physicians Dr. John Liu and  Dr. Marcel Filart.

115.   In addition to PAMC paying Dr. Liu $1,834 per month in a Sublease Agreement and paying an additional $4,000 per month for a Shared Marketing Agreement, PAMC compensated Dr. Liu by naming him, at various points in time, Medical Director of Acute Rehab, Medical Director of Continuity of Care, and Medical Director of PAMC's mental health wing "1 West" because of his high volume of referrals/admissions.  Qui Tam Relator Paul Chan does not know the dollar amount paid to Dr. Liu in these directorship positions.

116.   As to Dr. Filart, Qui Tam Relator Paul Chan was told by Business Development Department management that he had "$10,000 to play with" so that he could offer Dr. Filart $10,000 per month in various payment arrangements. Mr. Chan never made any compensation offer to Dr. Filart.  Mr. Chan did, however, witness PAMC Interim Vice President of Business Development Patricia Suarez tell Dr. Filart on June 5, 2013 that PAMC would name him Medical Director of Continuity of Care, but that the directorship position would require him to provide 15 - 20 referrals/admissions to PAMC each month.  Dr. Filart responded by saying "There are Stark laws." Dr. Filart also asked if Ms. Suarez would put the offer in writing.  When Ms. Suarez and Mr. Chan returned to the PAMC offices, Ms. Suarez said "*Fuck that.  I'm not putting that in writing.*"  Dr. Filart later accepted the Medical Directorship position which, on information and belief, paid him $6,000 per month.

117.   PAMC received many Medicare and Medi-Cal patient referrals/admissions from physicians with prohibited compensation arrangements and illegal remuneration arrangments via medical directorships whose compensation was made with a purpose to induce referrals, and was **determined in a manner that takes into account the volume or value of referrals**.   PAMC

6/9/2010 "Delv sublease ck to Faragalla. He said he is having health fair in two wkds wants Martha R to call him re details. Also talked to him about admissions… told him he only had couple in May and really need his support right now."

7/13/2010 "Met with MD to discuss sublease, and volume @ Aghapy. Told him we are terminating Sublease. And that numbers at Aghapy need improvement or else we may have to terminate that contract too. He suggested we meet Mon morning at his office. Will run it by M. Rivera and invite M Roman to attend."

7/27/2010 "Dropped off sublease… he had another pt this week for Med Surge… he wants to re-instate sublease… he says he will send us pts. He has send 3 pts since the letter. Also, spoke to him about OB volume. He asked about the retention person… he is open to any changes."
8/8/2010 "He sent another admission to us this week… per M. Rivera if he continued the trend of sending us pts weekly (which he has… I will track number and submit to RZ) we would cancel the cancellation letter. I need an update on this strategy."

8/25/2010 "Dr. Faragalla sent another admission this week… any chance we will be able to reinstate the sublease? Even if it is at a reduced rate?"

10/28/2010 "Met with Faragalla re admissions… he said he will try to send more patients but wants to know if we will restart the sublease? I told him (per BEF last msg) if he admits 5+ consistently for 2-3 months we would do new sublease. He also mentioned some concerns re Sylvia in HP."

Dr. Marcel Filart
5/3/2010 "Visited and met with Dr. He knows my goal for him is 20… Also discussed with him the two candidates for Phys Guarantee. Presented him with the Cvs. MY helping me set up interview."

5/6/2010 "Spk w Md re interview next week with new provider and admissions."

7/27/2010 "Met with MD Fri, took KP and JM to his office. All is ok.. He mentioned some frustation with EHS… but he is handling it himself. All is ok… text him this morning re admissions. His mtg is about 12… we need 5 from him this week."

11/5/2010 "Meeting with BEF and Filart went well. He recommitted to 20 admits per month. We will ride the wave until Yan and Filart settle their agreement."

Case 2:16-cv-09837-DSF-SK Document 128-3 Filed 04/08/21 Page 70 of 75 Page ID #:361
Case 2:16-cv-09837-DSF-SK Document 128-3 Filed 04/02/21 Page 73 of Page ID #:369
#:1258

5/20/2010 "RTHL classes in questions for month of June. Await Martha and PS assessment."

5/26/2010 "Spoke with Dr. Sevilla… he wants to do an event… I will press for 5 admissions… see what I can do. Not promising anything to him though."

7/7/2010 "Sevilla called. Spk to him briefly about admits/RTHL events. Same as last month. We need to see at least 5 admits per month to do RTHL events moving forward."

Dr. Cesar Velez
5/6/2010 "Delv contract, thank them for the admissions mtd"

5/19/2010 "Per M. Rivera leave Med Staff issues alone… continue to encourage Admissions… will let the dust settle for now…. I will remind Velez that we have sublease and need his support."

6/1/2010 "Dropped off sublease check. Velez said all is fine. He reached his goal for the month of May."

12/7/2010 "Delivered sublease check. Second sublease is pending, he asked me about it. Velez continues to support us with admits."

Dr. Yan
11/11/2010 "GR stopped by to drop off phys order forms, transportation and important numbers for the hospital. Briefly inserviced his staff. Met with Freddie and told him black and white that we need to double our efforts since we are doubling resources. He knows Filart was only sending us about 15 pts… so I told him we need 30… I think we will see for sure 25 pts per month. The rest of the month we may see a peek since Filart will be out of town and Yan will be handling everything. Freddie said they will send everything to us. Freddie also said that the deal is going through and that it benefits Filart to do this."

2/15/2011 "Dropped off Jan check. Also we discussed the deal w Filart, SNF assignments, and admisisons volume. Also set the meeting with JE, BEF and Yan."

**Piper Allen (Physician Integration Manager) Access call notes.**
Dr. Jeremiah Aguolu
4/28/2010 "Dropped off flyers, Dr. happy with production, will have staff start using and also passing out to patients. Discussed patient admissions

the full details of these arrangements, referrals/admissions, patient information and each related Medicare and Medi-Cal claim submitted and the corresponding Medicare, Medi-Cal and DSH reimbursements. The list and information to which Mr. Chan had access in his normal job function is as follows:

| Physician/Clinic | Compensation Arrangement | PAMC's Payment |
| --- | --- | --- |
| Dr. Ali Abaian | Marketing Agreement | $4,000/month |
| Dr. Peyman Banooni | Sublease Agreement | $2,253/month (PAMC cut Dr. Banooni's sublease amount because of his low admissions) |
| Dr. Rufino Cadano | Sublease Agreement | $2,610/month (even though Dr. Cadano never hosted any event) |
| Dr. Lulu Chen | Sublease Agreement Marketing Agreement | $1,913/month $3,000/month |
| Dr. Paul Chu | Sublease Agreement | $2,501/month |
| Dr. S. Paul Daniels (Health & Wellness MedicalClinic) | Sublease Agreement | $2,240/month |
| Dr. Maged Faragalla | Marketing Agreement | $5,000/month |
| Dr. Marcel Filart | Marketing Agreement Medical Directorship | $5,000/month $6,000/month |
| Dr. Byron Flores | Sublease Agreement | $2,225/month |
| Dr. Cadrin Gill | Sublease Agreement | $3,401/month (after more than five years, PAMC cancelled the sublease because of Dr. Gill's low admissions) |
| Dr. Enriqui Gonzalez | Marketing Agreement | $2,500/month (PAMC cut Dr. Gonzalez's Marketing Agreement amount in April 2013 because of his low admissions) |

134.  Excerpt of Preliminary Provider Report, Year 2007:

## PRELIMINARY PROVIDER REPORT

| | Monthly $ | Yearly $ | Annual Activity | | Monthly Activity Avg. | | Rank | $ / Admit | Rank - ROI |
| | | | 2006 | 2007 Annualized | 2006 | 2007 | | | |
|---|---|---|---|---|---|---|---|---|---|
| Liu SM $4K & sublease $1834 (incl. wound & med/surg) | $5,834 | $70,008 | 247 | 80 | 21 | 7 | Combined below | $875 | |
| Chen | $1,956 | $23,472 | 69 | 195 | 6 | 16 | | $120 | |
| Axis Medical Group (incl. wound & med/surg) | | | 141 | 92 | 12 | 8 | Slug | $0 | |
| Daniels (incl. wound & med/surg) | $2,240 | $26,880 | 101 | 148 | 8 | 12 | Winner | $182 | Winner |
| Ngo | $1,580 | $18,964 | 64 | 88 | 5 | 7 | Slug | $216 | Winner |
| Velez 2 clinics | $2,814 | $33,768 | 134 | 132 | 11 | 11 | Grinner | $256 | Winner |
| Liu / Chen | $7,790 | $93,480 | 316 | 275 | 27 | 23 | Winner | $340 | Grinner |
| Flores | $2,225 | $26,700 | 68 | 78 | 6 | 7 | Slug | $342 | Grinner |
| Filart (using 10 months for avg) | $5,000 | $60,000 | 0 | 140 | 0 | 14 | Winner | $429 | Slug |
| Gill (incl. wound & med/surg) | $3,481 | $41,772 | 45 | 97 | 4 | 8 | Slug | $431 | Slug |
| Sevilla (SM & sublease) (incl. wound & med/surg) | $2,946 | $35,352 | 67 | 57 | 6 | 5 | Slug | $620 | Sinner |

**Rank / Activity**

Winners: ≥12

Grinners: 9-11

Slugs: 6-8

Sinners: ≤5

**Rank / $ per Admit**

Winners: ≤300

Grinners: $301 - $400

Slugs: $401 - $450

Sinners: ≥$451

///

///

64                                    Corrected Third Amended Complaint

Case 2:11-cv-00187-DGF-SK Document 163 Filed 04/08/21 Page 73 of 75 Page ID #:331
Case 2:11-cv-00187-DGF-SK Document 161 Filed 04/04/02 Page 73 of 72 of Page ID #362
#:1270

135.  "**Medical Surgical Accounts**" report, copied below, and plainly showing how it is PAMC's obvious wide-spread business model to pay referring physicians for referrals as follows:

## MEDICAL SURGICAL ACCOUNTS

| **Winners** | |
|---|---|
| Dr. Daniels: 12/182* | A Winner all the way around. Cooperative and loyal to PAMC. **Terrific volume and ROI.** |
| Dr. Filart: 14/429* | Volume is terrific, but current **ROI is at Slug level**. However, volume is expected to increase significantly, ranking him as a Winner. |
| Drs. Liu & Chen 23/340* | Using only direct admit numbers for evaluation. Winners with respect to volume, but **ROI places them at Grinner level**; however UR issues impact negatively on overall performance. Nevertheless, consider them Winners when loyalty to PAMC is included in the equation. |
| **Grinners** | |
| Dr. Flores: 7/342* | His volume is at Slug level, but his **ROI is at Grinner level**. He maintains consistent performance in spite of severe practice challenges. Consider him a Grinner when all is considered. |
| Dr. Ngo: 7/342* | Using only direct admit numbers for evaluation. Volume is at Slug level, but **ROI is at Winner level**. Annualized 2007 volume shows an increase from 2006 and April was a great month for him with 10 direct admits. Consider him a Grinner. |
| Dr. Velez: 11/256* | At present, volume is at Grinner level, but his **ROI is at Winner level**. A Grinner  heading for Winner. |
| **Slugs** | |
| Axis Medical Group: 8* | Volume has decreased relative to 2006 in spite of HBO activity. |
| Dr. Gill: 8/431* | A **Slug at present both in volume and ROI**. Although volume has been erratic, his 2007 projections are double 2006 activity. However, March was a terrific month, at 15 admits, with Dr. Liu diligently following convalescent home patients. Sustained support of Dr. Liu following Dr. Gill's convalescent home patients should see volumes sustained at March levels (15). **Recommend two months to determine if contract amendment is indicated.** |
| **Sinners** | |
| Dr. Sevilla | Volume is low. Relationship needs strengthening if account is to thrive. **Inclined amend the contract**, but before taking that step will discuss situation with physician. Splitting with White? Practice issues? |
| * Average Admit  per Month / Business Development Cost per Admit (See attached for detail) | |

**(emphasis** added )

# Exhibit 9

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF LOS ANGELES
### DEPARTMENT OF PUBLIC HEALTH

3052020075725 — STATE FILE NUMBER

**CERTIFICATE OF DEATH**

3202019017225 — LOCAL REGISTRATION NUMBER

| Field | Value |
|---|---|
| 1. NAME OF DECEDENT—FIRST (Given) | VINCENT |
| 2. MIDDLE | PAUL |
| 3. LAST (Family) | MARTIN |
| AKA, ALSO KNOWN AS | — |
| 4. DATE OF BIRTH | 08/31/1935 |
| 5. AGE Yrs. | 84 |
| 6. SEX | M |
| 8. BIRTH STATE/FOREIGN COUNTRY | NY |
| 11. EVER IN U.S. ARMED FORCES? | X YES NO |
| 12. MARITAL STATUS | MARRIED |
| 7. DATE OF DEATH | 04/04/2020 |
| 8. HOUR | 0151 |
| 13. EDUCATION | ASSOCIATE |
| 14/15. HISPANIC? | X NO |
| 16. RACE | CAUCASIAN |
| 17. USUAL OCCUPATION | GRAPHIC ARTIST |
| 18. KIND OF BUSINESS OR INDUSTRY | ART |
| 19. YEARS IN OCCUPATION | 31 |

| Field | Value |
|---|---|
| 21. CITY | NORTH HOLLYWOOD |
| 22. COUNTY/PROVINCE | LOS ANGELES |
| 23. ZIP CODE | 91601 |
| 24. YEARS IN COUNTY | 59 |
| 25. STATE/FOREIGN COUNTRY | CA |

28. INFORMANT'S NAME, RELATIONSHIP: KATHRYN SESSINGHAUS, DAUGHTER

| Field | Value |
|---|---|
| 24. NAME OF SURVIVING SPOUSE—FIRST | EMMA |
| 32. NAME OF FATHER/PARENT—FIRST | JOHN |
| 33. LAST | — |
| 34. BIRTH STATE | NJ |
| 34. NAME OF MOTHER/PARENT—FIRST | ANNA |
| 35. MIDDLE | E. |
| 36. BIRTH STATE | NY |

| Field | Value |
|---|---|
| 38. DISPOSITION DATE | 04/16/2020 |
| 40. PLACE OF FINAL DISPOSITION | SCATTER AT SEA OFF THE COAST OF VENTURA COUNTY |
| 41. TYPE OF DISPOSITION | CR/SEA |
| 42. SIGNATURE OF EMBALMER | NOT EMBALMED |
| 44. NAME OF FUNERAL ESTABLISHMENT | VALLEY FUNERAL HOME |
| 45. LICENSE NUMBER | FD976 |
| 46. SIGNATURE OF LOCAL REGISTRAR | MUNTU DAVIS, M.D. |
| 47. DATE | 04/10/2020 |

| Field | Value |
|---|---|
| 101. PLACE OF DEATH | SERRANO N. CONVALESCENT HOSPITAL |
| 103. FACILITY ADDRESS | 5401 FOUNTAIN AVENUE |
| 104. COUNTY | LOS ANGELES |
| 105. CITY | LOS ANGELES |

**CAUSE OF DEATH**

| 107. CAUSE OF DEATH | |
|---|---|
| IMMEDIATE CAUSE | A. CARDIORESPIRATORY ARREST |
| | B. ESSENTIAL HYPERTENSION |
| | C. CORONARY ARTERY DISEASE |
| | D. |

112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107: NONE

| Field | Value |
|---|---|
| 114. I CERTIFY... Decedent Attended Since | 11/21/2018 |
| Decedent Last Seen Alive | 04/01/2020 |
| 115. SIGNATURE AND TITLE OF CERTIFIER | MARCEL FILART M.D. |
| 116. LICENSE NUMBER | A76022 |
| 117. DATE | 04/09/2020 |
| 116. TYPE ATTENDING PHYSICIAN'S NAME | MARCEL FILART M.D. 1711 W TEMPLE ST SUITE 1070, LOS ANGELES, CA 90026 |
| 119. MANNER OF DEATH | Natural |

STATE REGISTRAR: A B C D E

*010001004500339*

CENSUS TRACT

CALOSANGO1

---

### CERTIFIED COPY OF VITAL RECORD
#### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

This is a true certified copy of the record filed in the County of Los Angeles Department of Public Health if it bears the Registrar's signature in purple ink.



Health Officer and Registrar DO 11

DATE ISSUED APR 14 2020

002399459

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the Registrar.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

